(164 App. Div. 231)

FROHMAN v. FITCH et al.　(No. 6113.)

(Supreme Court, Appellate Division, First Department.　November 6, 1914.)

COPYRIGHTS (§ 47*)—ASSIGNMENTS—CONSTRUCTION — WRITING AND PRODUCING PLAY.

Under a contract executed in 1900, whereby plaintiff employed defendant to write and deliver a play, and bought the exclusive right to produce it, and which provided that it was to be produced only in first-class theaters, when neither party contemplated its production by means of moving pictures, the writer reserved no right to produce the play in that way, and plaintiff might enjoin such production.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 45;　Dec. Dig. § 47.*]

Action for an injunction by Charles Frohman against William G. Fitch and another, with a submission of a controversy under Code Civ. Proc. § 1279.　Judgment ordered for plaintiff.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

David Gerber, of New York City, for plaintiff.
Bernard M. L. Ernst, of New York City, for defendants.

McLAUGHLIN, J.　The plaintiff is, and on the 15th of February, 1900, was, the manager of certain theaters in the city of New York and elsewhere, and a large producer of plays throughout the United States.　On the day named he employed one Clyde Fitch, a reputable writer of plays, to write a play for him, and the same was to be delivered on or before the 1st of January following.　The agreement between them was in part as follows:

"Whereas the said party of the first part agrees to write and deliver a play on or before January 1, 1901;　and whereas, the said party of the second part desires the exclusive right to produce or to have produced the said play in the United States of America and in Canada: Now, therefore, * * * the said party of the first part agrees to, sell, assign and transfer, and hereby does sell, assign and transfer, to the said party of the second part the exclusive right to produce the said play in the United States of America and in Canada, for which sale, assignment and transfer the said party of the second part agrees to pay to the said party of the first part or to his authorized agent as follows."

Then follow provisions for the payment of $500 on the execution of the agreement, and if the play were accepted a further sum of $500, both payments in advance of the authorized royalties—the royalties thereafter accruing to depend upon the receipts.　There was also a provision in the contract to the effect that, if the play were produced, it was to be in a first-class theater and in a first-class manner.

Fitch wrote the play, gave it the name of "Captain Jinks of the Horse Marines," and delivered it to the plaintiff, and the same was accepted within the time specified in the contract.　It was produced with success by leading actresses in the principal cities of the United States, and was a valuable theatrical production.　The contract, some three

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

years after its date, was modified by permitting the plaintiff to lease the play to stock companies, and providing that the receipts received from such leasings should be at the rate of 50 per cent. to each of the parties to the contract.

When the play was originally produced, it was only in first-class theaters, in which the price for orchestra seats was $2 in large cities and $1.50 in other cities, the price for other parts of the theaters being relatively smaller; but when the play was performed in so-called stock theaters—that is, theaters run by stock companies—the prices varied from $1 to 15 cents, according to the city, theater, and location of seats.

Clyde Fitch died on September 4, 1909, and all his property, including his rights under the contract referred to, passed to his father, the defendant William G. Fitch. In March, 1914, William G. Fitch entered into a contract with the defendant American Play Company by which he assumed to grant to it the right to produce the play throughout the United States and Canada by means of moving pictures, and the Play Company has publicly announced that it intends to produce the play in that way.

According to the agreed statement of facts, the Play Company knew of the original and subsequent contracts between Clyde Fitch and the plaintiff when it entered into the contract with William G. Fitch. The defendant's counsel conceded, upon the argument of the question presented, that a moving picture presentation of the play in the manner contemplated by the Play Company would constitute the production of a play, but contends that the right to such a production was reserved to Clyde Fitch, and upon his death passed to William G. Fitch.

This contention is based upon the argument that, at the time the contract was entered into, neither of the parties contemplated production of the play by means of moving pictures. Even though it be conceded that neither of the parties had in mind the production of the play in that manner, nevertheless I think it is a clear violation of the contract to permit the play to be so produced. The contract, as we have seen, gave to the plaintiff the "exclusive right to produce or to have produced the said play in the United States of America and in Canada." This exclusive right was to protect the plaintiff in the property which he had purchased. That the plaintiff's rights under the contract constituted property cannot be questioned. That by the aid of science it has, since the contract was executed, been made possible to produce the play in some manner not then contemplated, does not give William G. Fitch, nor the American Play Company, the right to destroy plaintiff's property or diminish the value of what he purchased.

The fact that the plaintiff agreed to produce the play only in first-class theaters and in a first-class manner does not contemplate that the author of the play reserved to himself the right to produce it in a second-class theater in a second-class manner. On the contrary, this provision was inserted in the contract to protect the author of the play, by insuring to him that his production should only be produced in a credible place and in such a way as would add to his reputation.

If the foregoing view be correct, then the plaintiff is entitled to a judgment enjoining and restraining the defendants from producing the play in the manner contemplated, with costs.   All concur.