### KLEIN et al. v. BEACH et al.

(District Court, S. D. New York. February 23, 1916.)

1. COPYRIGHTS ⬦⟝50—CONTRACT RELATING TO DRAMATIC RIGHTS IN COPYRIGHTED BOOK—CONSTRUCTION—"PRESENTATION ON THE STAGE."

The writer of a novel, who owned all rights therein, a dramatic writer, and a theatrical producer entered into a contract in 1911 by which the novelist granted to the dramatist the exclusive right to dramatize the book "for presentation on the stage," and both granted to the producer, on terms stated, the exclusive right to "produce, perform, and represent the said play * * * on the stage," for which it was to pay a royalty, to be divided equally between them. The contract further provided that in case of failure of the producer to comply with its terms, or on its termination otherwise, all rights in the play granted to it should revert to the other two parties. Held, that the phrase "presentation on the stage," construed in connection with other provisions respecting production of the play by stock companies, stage scenery, etc., had reference only to the production of the spoken play in theaters, and that as, at the time the contract was made, the production of moving picture plays was a well-known business, it was not intended that the contract should carry the exclusive right to dramatize the novel for that purpose, but that such right remained in the author.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⬦⟝50.]

⬦⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. COPYRIGHTS ⊜⟿50—CONTRACT RELATING TO DRAMATIC RIGHTS IN COPY-
RIGHTED BOOK—EFFECT OF AMENDMENT OF STATUTE.

The rights of the parties under such contract were in no way affected by the subsequent amendment of the Copyright Law (Act March 4, 1909, c. 320. § 5, 35 Stat. 1076) by Act Aug. 24, 1912, c. 365, 37 Stat. 488 (Comp. St. 1913, § 9521), so as to permit the separate copyrighting of motion picture plays.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⟿50.]

3. COPYRIGHTS ⊜⟿50—CONTRACT RELATING TO DRAMATIC RIGHTS IN COPY-
RIGHTED BOOK—CONSTRUCTION.

On the subsequent termination of the contract with the producer for its default, all rights in the play written by the dramatist reverted to him and the author of the book as tenants in common, and either had the right to license its use, subject to the obligation to account to the other for one-half the profits.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 47, 49; Dec. Dig. ⟿50.]

In Equity. Suit by Philip Klein, as executor, and Lillian Klein, as executrix, of the will of Charles Klein, deceased, against Rex Beach and the Selig Polyscope Company, Incorporated. On motion to dismiss bill. Denied as to defendant Beach, and granted as to defendant corporation.

This is a joint motion on behalf of the defendants to dismiss the complaint, on the ground that it does not allege facts sufficient to constitute a cause of action. The complaint sets forth that Charles Klein, deceased, was a dramatic author and playwright, who had achieved great fame and had composed many successful and notable plays and dramatic compositions; that the defendant Rex Beach was the author of a novel entitled "The Ne'er Do Well"; that the defendant the Selig Polyscope Company, Incorporated, is a manufacturer and distributor of motion pictures; that on November 17, 1911, Klein and Beach entered into a written contract, a copy of which is hereinafter set forth.

The complaint further shows that thereafter Klein devised and completed a dramatic version of the novel, and performed all the terms of the contract on his part to be performed; that the dramatization was produced with success throughout the United States, was a work of great literary merit, and of great value to the plaintiffs; that thereafter the Authors' Producing Company failed to give 70 performances during one season, and all rights in the Klein version reverted to Klein and Beach; that later Beach, disregarding the rights of Klein, and in derogation thereof, made an agreement with the defendant Selig Polyscope Company whereby he assumed to grant to said defendant the right and license to dramatize the novel and to make and exhibit cinematographic films thereof and of the dramatic composition of Klein bearing the same name based on the novel; that the defendants, with full knowledge of Klein's rights, for the purpose of making cinematographic films dramatizing the novel and to reproduce the play, gave a pantomimic representation of the novel and play, and during that representation negative moving picture films were taken, and thereafter positive films were made for exhibition from such negative film; that the defendant Selig Company has advertised the films for release and booked them throughout the United States against the protest of plaintiffs; that the film is identical with the novel, and with the Klein play as produced by the Authors' Producing Company, except that it has been elaborated to make it suitable for moving picture exhibitions; and that the film is a dramatization of the novel.

After setting forth other allegations to give the court jurisdiction and to bring plaintiffs properly in equity, the complaint alleges that the film is being

booked throughout the United States and Canada in cheap and inferior theaters, to which small admission fees are charged, and that the use of the film in moving pictures will make it impossible to secure the production of any dramatization by living actors, either in first-class theaters or by stock or repertoire companies, and will destroy the value of any such dramatization, and plaintiffs' rights therein; and that both the defendants have refused to pay to plaintiffs any part of the profits or royalties derived from the use and exhibition of the film based upon the novel and the dramatic composition. Plaintiffs ask for an injunction, an accounting, the surrender of the films, and damages.

On the argument all counsel stated that, as no questions of fact were involved, they requested a decision on the whole controversy, and to that end it was agreed that the contract between Beach and the Selig Company should be read by the court as part of the papers on the motion to dismiss. For the convenience of counsel, in cases of this character, I have extracted the essential features and language of both contracts:

### Agreement Between Authors' Producing Company, Beach, and Klein.

Agreement made * * * November 17, 1911, by * * * the Authors' Producing Company, a domestic corporation, * * * hereinafter referred to as the manager; Rex Beach, * * * hereinafter referred to as the novelist; Charles Klein, * * * hereinafter referred to as the author, witnesseth:

Whereas, the novelist is the sole owner of the dramatic rights of a certain original novel entitled "The 'Ne'er Do Well"; and

Whereas, the manager wishes to engage the services of the author to dramatize the said book for presentation on the stage; and

Whereas, the novelist wishes the author to make the said dramatization of the said book (which said dramatization shall hereinafter be referred to as "the play"); and

Whereas, the manager desires to obtain the exclusive right, liberty, and license to produce, perform, and represent the said play in the United States of America and the Dominion of Canada; and

Whereas, the said novelist and author are willing to grant to the said manager the exclusive rights to produce the said play in the said territory under certain terms, provisions, and conditions, etc.

First. The novelist hereby grants to the author the sole and exclusive right to dramatize the said book for presentation on the stage, and agrees that the author shall receive one-half of all moneys paid as royalty for the said play, except as provided in clause seventh.

Second. The author and the novelist hereby agree to grant, and by these presents hereby do grant, to the manager, subject to the terms, conditions, and limitations hereinafter expressed, the sole and exclusive license and liberty to produce, perform, and represent the said play or dramatic composition on the stage in the United States of America and the Dominion of Canada.

Third. The manager in consideration of such grant, hereby pays to the novelist, the sum of one thousand dollars ($1,000.00) upon the signing and execution of this agreement, etc.

Fourth. The manager further agrees to pay the author and the novelist, as royalty for the said play, .* * * a sum equal to, etc.

Fifth. In case the manager shall desire after the first representation of the said play under this contract, to represent or produce the said play by more than one company, it shall be at liberty to do so; and in that case each company shall be treated, for the purpose of computing the royalties hereunder, as a separate undertaking, etc.

Sixth. It is expressly understood and agreed that neither this contract nor the rights granted to the manager herein shall be assigned or assignable by it, nor shall the said play be sublet by the manager without its first having received the consent in writing, of the author and the novelist so to do.

Seventh. If the said play is ever produced in stock theaters or by small touring companies under other management, the royalty received from any and all such productions shall be divided, etc.

Eighth. The manager expressly agrees that it will produce, exhibit, and represent the said play only in first-class theaters and in a first-class manner, with a competent cast to be selected or approved by the author and the novelist, and a properly qualified stage director, as all these terms are generally understood in the theatrical profession, and in a manner satisfactory to the said author and novelist. The author shall also have full and entire control of the stage and entire choice of scene models and scenery and the selection of all costumes, properties, and accessories for the production for the first company. The author shall also stage the play for the production by the first company.

Ninth. The said manager further agrees to produce the said play for a consecutive run in an evening bill in a first-class theater on or before the 17th day of November, 1912. And it is further agreed that, if the said play is not produced and presented by the said manager on or before the said 17th day of November, 1912, the said manager will return to the author all manuscripts and parts of the said play in its possession or under its control, and further agrees that all rights of whatsoever name, kind, or nature in and to the said play and all rights granted by this contract shall forthwith cease and determine and shall revert to the said author and the novelist to be disposed of as may seem best to them. * * * If the said play is then not produced on or before the said 17th day of February, 1913, then the manager agrees forthwith to return to the author all manuscripts and parts of the said play in its possession or under its control, and shall lose all rights of whatsoever name, nature, or description in and to the said play and all rights granted to him by this contract and all rights shall revert to the author and the novelist forthwith.

Tenth. The said manager expressly agrees to announce in appropriate type on all * * * advertising matter * * * that the said play is a dramatization by Charles Klein of Rex Beach's novel, "The Ne'er Do Well."

Eleventh. The said manager agrees that no alterations, eliminations, emendations, changes, or additions of any sort whatsoever shall be made in the text of the said play without the consent of the author first obtained in writing, and the said author agrees that he will make such reasonable, proper, and necessary changes or modifications in the said play as may be mutually considered by the author and the manager to be necessary or advisable during rehearsals or within a reasonable time after the first production of the said play.

Twelfth. The said manager further agrees that if, during any one theatrical year, * * * the said play has not been produced and presented by it with a traveling road company for seventy (70) performances, all the rights of the said manager in and to the said play shall cease and determine and shall immediately revert to the said author and novelist.

Thirteenth. The author and the novelist hereby grant an option to the manager to acquire the acting and producing rights in the said play for the Kingdom of Great Britain and Ireland and its colonies (Canada excepted), etc.

Fourteenth. If the said manager shall at any time, in any way fail to fulfill any of the terms and conditions in this contract contained, * * * the said author and the novelist or their duly authorized agent, may thereupon * * * give notice terminating this agreement absolutely, and any and all rights granted or assigned by the author and the novelist to the manager herein, shall thereupon immediately cease and determine and shall thereupon immediately revert to the author and the novelist. * * *

Fifteenth. It is further agreed that upon the termination of this agreement for whatsoever cause, the manager will forthwith return to the author all manuscripts and parts of the said play in its possession and under its control, together with all additions to or alterations in the same, all of which shall always definitely belong to the said author and the novelist.

Sixteenth. It is understood that Selwyn & Co., play brokers, are the agents who have procured the execution of this contract, and that as such agents are entitled to receive an amount equal to, etc.: Provided, however, that if and when the play shall be produced in stock, or by small touring companies un-

der other management, the said brokers shall be entitled to receive an amount equal to, etc.

### Agreement Between Beach and Selig Company.

Agreement made * * * March 3, 1914, * * * between Rex Beach, * * * hereinafter called the author, and the Selig Polyscope Company, incorporated, * * * hereinafter called the producer, witnesseth:

Whereas, the author is the sole author and owner of all right, title, and interest in and to a certain copyrighted novel entitled "The Ne'er Do Well"; and

Whereas, the producer desires to secure and to acquire from the author the sole and exclusive right, license, and privilege to produce the said novel "The Ne'er Do Well" as a motion picture film, and to manufacture sell, lease, and otherwise exploit the same as such throughout all countries of the world:

Now, therefore, in consideration, etc., the author and the producer agree as follows:

First. The author hereby grants the producer the sole and exclusive right, license, and privilege to reproduce the novel, "The Ne'er Do Well" in motion pictures, and to manufacture, sell, lease, and otherwise exploit films from said reproduction.

Second. The producer agrees to pay the author, for said exclusive rights, licenses, and privileges, one-half of all net profits from every source accruing to the producer from the manufacture, sale, leasing of, or otherwise exploiting said reproduction. * * *

Ernst & Cane, of New York City (Bernard M. L. Ernst, of New York City, of counsel), for complainants.

Weadock & Miner, of New York City (Karl R. Miner, of New York City, of counsel), for defendant Beach.

Nathan Burkan, of New York City, for defendant Selig Polyscope Co.

MAYER, District Judge (after stating the facts as above). At the outset, it is desirable to clear away immaterial or untenable contentions.

First. The relations of the parties must be determined by the written agreements between them, and not by those allegations of the complaint which plead conclusions of law. Thus the complaint alleges inter alia:

"That in and by said agreement the defendant Rex Beach gave to the said Charles Klein the sole and exclusive right to dramatize the book"

—while in the agreement are the added words "for presentation on the stage." Therefore what the right was must be determined by the contract, and not by the interpretation of the pleader.

[1, 2] Second. The amendment of the Copyright Law, effective on August 24, 1912, is irrelevant to the controversy. That amendment, so far as here concerned, merely provided, among other things, for the copyrighting of motion picture plays. The contract here was dated November 17, 1911, and the contractual relations between Beach and Klein were fixed as of that date. The subsequent agreement (with notice, according to the complaint) between Beach and the Selig Company gains nothing, because now, under the statute, the motion picture rights may be separately dealt with and separately copyrighted.

We thus come to the fundamental questions in the case. It may be assumed that in November, 1911, the time of the contract, the motion

picture play was well known. This knowledge is judicially obtained from the files of the court and from reported decisions, notably the Kalem Case, 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285; Id., 169 Fed. 61, 94 C. C. A. 429.

With the knowledge that a play might be produced on the stage with the spoken word or exhibited on the screen, Authors' Producing Company (the manager) was looking for a new play. Beach owned the novel, "The Ne'er Do Well." Klein was a playwright of recognized ability and experience. The manager wished Klein to make a play out of the novel and to obtain the exclusive right to produce, perform, and represent that play on the stage in the United States and elsewhere.

Throughout, it is apparent that the manager was to produce and present the play on what we understand as the stage as distinguished from the screen. Vide "stock theaters;" "small touring companies;" Klein shall have full control of "the stage" and "entire choice of scene models and scenery and the selection of all costumes * * * for the production for the first company"; the manager cannot make changes "in the text" without Klein's consent; certain arrangements with the play brokers as to compensation, if the play is produced "in *stock* or by small *touring* companies *under other* management."

The manager, therefore, being concerned only with a play with speaking actors, the parties whereased and agreed as follows:

"Whereas, the manager wishes to engage the services of the author to dramatize the said book *for presentation on the stage:* * * *

"First. The novelist hereby grants to the author the sole and exclusive right to dramatize the said book *for presentation on the stage.* * * *

"Second. The author and the novelist hereby agree to grant and * * * do grant to the manager * * * the sole and exclusive license and liberty to produce, perform, and represent the said play or dramatic composition *on the stage.* * * *"

Not a word was written about motion pictures. It is argued that, if it was intended to exclude motion pictures, such exclusion would have been expressed. It may be urged with equal force that, if it was intended to include them, the inclusion should have been definitely stated. Klein, as the complaint points out, had achieved great fame as a dramatic author, and the product of his talent applied to the story of the novel was what Beach, Klein, and the manager proposed to present on the stage; but it does not follow that the contracting parties intended that there should be no grant by Beach of the motion picture rights to any one and that only stage performances with speaking actors could be given. By virtue of paragraph twelfth the manager's rights "reverted" to Beach and Klein, and under paragraph fifteenth all manuscripts and parts of the play, with all additions and alterations thereafter, were to "definitely belong" to Beach and Klein. Thus, at the commencement of this suit, Beach and Klein's estate were the co-owners, or, as some cases say, the tenants in common, of the Klein play, freed from any license.

It is urged that Klein became the sole owner of the Klein dramatization, to do with it as he pleased, obligated only to account to Beach for profits. That argument flies in the face of the intent of the agree-

ment when read as a whole. It thus becomes necessary to determine what the grant from Beach to Klein was.

The "exclusive right to dramatize" the novel "for presentation on the stage" merely meant that no one else was to be permitted to dramatize for the stage, but did not comprehend that Beach could not grant the right to another independently to dramatize the novel for the screen. Of course, "stage" is a comprehensive term. College commencements, public meetings, motion picture exhibitions take place on the physical structure called "a stage"; but "presentation on the stage" in this contract surely means the spoken play.

It is suggested that to hold that Beach retained the motion picture rights would violate the intent of the parties, because the motion picture would destroy or impair the commercial value of Klein's dramatic version, and that Klein and the others could not have contemplated such a result. I am far from satisfied that every motion picture interferes with the box office receipts from the same play on the dramatic or the operatic stage. I imagine that the motion picture "Carmen" will not outlast the living opera.

Then it is quite understandable that a novel may be presented to a theater audience in a way quite different from that shown to a motion picture audience and for reasons which are obvious to those who attend both. Arnold Bennett's "Buried Alive," when transformed into "The Great Adventure," was neither more nor less than a character study of Farll and Alice Challice. No one could satisfactorily portray in a picture the study which Ainley or Harding acted on the stage; but "Buried Alive" on the screen would probably show the scene in Westminster Abbey, omitted by the playwright.

And so it may well be, as I think was the case here, that the right to dramatize a novel for presentation on the stage does not necessarily carry with it all the motion picture rights. There is nothing in the reported cases to lead to any other conclusion.

In the Kalem Case, supra, a contract was not being construed, but the court was dealing with the question as to whether one without authority could appropriate the essential features of a copyrighted work and produce them in a motion picture. The court held that such a production was dramatized within the meaning of the statute. No one now questions that the moving picture may show a dramatization, and in the case at bar the presentation on the screen is a dramatization; but we are not dealing with definitions, but with the intent of the parties.

In Frohman v. Fitch, 164 App. Div. 232, 149 N. Y. Supp. 633, Fitch, who had agreed to write and deliver a play, had sold his original work to Frohman under a broad grant which clearly comprehended the ownership of Fitch's work by Frohman for all purposes. The language there was:

"Whereas, the said party of the first part [Fitch] agrees to write and deliver a play on or before January 1, 1901; and

"Whereas, the said party of the second part [Frohman] desires the exclusive right to produce or to have produced the said play in the United States of America and in Canada:

"Now, therefore, * * * the said party of the first part agrees to sell, assign, and transfer, and hereby does sell, assign, and transfer to the said

party of the second part the exclusive right to produce the said play in the United States of America and in Canada, for which sale, assignment and transfer the said party of the second part agrees to pay to the said party of the first part or his authorized agent, as follows. * * * "

In Harper Brothers v. Klaw & Erlanger, 232 Fed. 609, decided by Judge Hough on January 6, 1916, the agreement was made at a time (1899) when motion picture plays were not in the contemplation of either party, and he held, on the facts in that case, therefore, that neither party could produce motion pictures. He was considering a contract made at a time when conditions were radically different from those which existed in 1911; but, in so far as he construed the language used in that contract (which, in substance, resembles that in the case at bar), he held that the grant did not pass the motion picture rights.

[3] This case, however, differs from Harper v. Klaw in at least one respect which becomes important. Here both Beach and Klein became the owners of Klein's drama, and each could then do with it what he pleased, with the duty of accounting over. Beach could license Klein's dramatic version for the screen, and Klein could do the same thing; and, of course, they each could license others to produce the Klein play on the stage. But in all these instances one would be obliged to account to the other. Millson v. Lawrence, 148 App. Div. 678, 133 N. Y. Supp. 293; Lalance & Grosjean Mfg. Co. v. Nat. Enameling & Stamping Co. (C. C.) 108 Fed. 77.

As Beach, therefore, could license another either to produce an independent dramatization for the motion pictures, or to produce the Klein version for the motion pictures, the defendant Selig Company was at liberty to contract with Beach, and is not concerned with the controversy between Beach and the Klein estate. It follows, therefore, that neither Beach nor the Selig Company can be enjoined as prayed for.

But there is enough left in the complaint to set forth a cause of action for an accounting (see paragraphs XXI and XXII) for profits already derived. If it appeared as a fact that the Selig production is an independent dramatization, then, in view of what has been pointed out, the plaintiffs would not have a cause of action; but it is alleged (paragraph X) that Klein "originated, devised, créated" a play based upon the novel, and further (paragraph XVI) that the "said film [made by Selig Company] * * * is identical with the said novel * * * and with the said play,. * * * except that the same has been elaborated to make it suitable for motion picture exhibitions."

Of course, with a common source, two dramatizations must have much in common; but it is alleged that Klein's work is "of great literary merit, woven with keen dramatic skill and artistic finish." And it is well known that skill is required to select from the mass of material in a novel, so much as may be necessary and then properly arrange the acts, scenes, sequence, climax, and the rest.

Whether, therefore, Klein's dramatization has been used by the Selig Company, or an independent motion picture has been devised from the novel, is a question of fact, which can be determined only after a

trial. As it is alleged that Klein's version has been used, the complaint states a cause of action against Beach for an accounting.

For the reasons stated, the motion to dismiss made on behalf of Beach must be denied, and that made on behalf of Selig Company must be granted. Settle on two days' notice.