## MANNERS v. MOROSCO.

### (District Court, S. D. New York. November 29, 1918.)

1. COPYRIGHTS ⟨⟩50—CONTRACT—RIGHT TO PRODUCE PLAY—CONSTRUCTION.

Contract by which the author of a play granted to a manager the exclusive right to produce it, and the manager agreed to give it at least 75 performances each theatrical season for five years, otherwise the contract to terminate, *held* not limited to a term of five years, but to continue in force so long as the manager desired and paid the stipulated royalty.

2. COPYRIGHTS ⟨⟩50—GRANT—RIGHT TO "PRODUCE" PLAY—MOTION PICTURE RIGHTS.

A contract granting the exclusive right to "produce" a play *held* to include the right to present it in motion pictures.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Produce.]

In Equity. Suit by J. Hartley Manners against Oliver Morosco. Decree for defendant.

For convenience of counsel interested in this class of case, the essential features of the two contracts between the parties are here set forth. For brevity, they will be referred to as the first and second contracts.

#### First Contract.

"Whereas, the party of the first part is the sole and exclusive author and owner of a certain dramatic composition at present entitled 'Peg O' My Heart'; and

"Whereas, the party of the second part wishes to obtain the exclusive right and license to produce, perform, and represent the said play in the United States of America and the Dominion of Canada:

"Now, therefore, in consideration of the premises * * * it is hereby understood, covenanted, and agreed by and among the parties to the agreement as follows:

"First. The party of the first part hereby grants, and by these presents hereby does grant, to the party of the second part, subject to the terms, conditions, and limitations hereinafter expressed, the sole and exclusive license and liberty to produce, perform, and represent the said play in the United States of America and the Dominion of Canada.

"Second. The party of the second part, in consideration of such grant, hereby agrees to pay to the party of the first part the sum of five hundred ($500.00) dollars upon the signing and execution of this agreement * * * in advance of the royalties to accrue to the party of the first part under this agreement. * * *

"Third. The party of the second part agrees to produce the play not later than January 1, 1913, and to continue the said play for at least 75 performances during the season of 1913–1914, and for each theatrical season thereafter for a period of five years.

"Fourth. The party of the second part further agrees to pay to the party of the first part * * * further sums as royalties, as follows:

"Five per cent. (5%) of the first four thousand five hundred ($4,500) dollars gross weekly receipts; seven and one half (7½) per cent. on the next two thousand ($2,000) dollars gross weekly receipts; and ten (10%) per cent. on all sums over that amount of six thousand five hundred ($6,500) dollars gross weekly receipts—which said sum of money, together with certified box office statements, the party of the second part agrees to send to the party of the first part.

"Fifth. The said party of the second part further agrees that if during any one theatrical year, such year to begin on the 1st day of October, said

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

254 F.—47

play has not been produced or presented for 75 performances, then all rights of the said party of the second part shall cease and determine and shall immediately revert to the said party of the first part.

"Sixth. It is further agreed that the said party of the second part shall present the said play in first-class theaters with a competent company, the said company to be mutually satisfactory to both the parties to this agreement, and with Miss Laurette Taylor in the title role of 'Peg O' My Heart,' and that the play will have a production in New York City, and will be continued on the road with Miss Taylor in the part of 'Peg,' for at least one season, or longer, if considered advisable by both parties to this agreement.

"Seventh. No alterations, eliminations, or additions to be made in the play without the approval of the author.

"Eighth. The rehearsals and production of the play to be under the direction of the author.

"Ninth. The name of the author to appear on all advertising, reading, and printed matter used in connection with the play.

"Tenth. The author to have the right to print and publish the play, but this right is not to be exercised by the author within six months after the production of said play in New York City, unless the written consent of the manager has first been obtained.

"Eleventh. Said manager does hereby agree that he will not lease, sublet, assign, transfer, or sell to any person or persons, firm or corporation, any of his aforesaid rights in and to the said dramatic composition or play, without the written consent of said author has first been obtained. Should the play fail in New York City and on the road, it is agreed between both parties it shall be released for stock.

"Twelfth. Whenever the play is released for stock, the royalties received from the stock theaters to be divided equally between the party of the first part and the party of the second part.

"Thirteenth. This agreement is binding upon the parties hereto, upon their heirs, executors, assigns, administrators, and successors. * * *"

To this agreement there was an addendum as follows:

"It is further agreed that after Miss Taylor shall have finished her season in 'Peg O' My Heart,' as provided for in this contract, her successor in the rôle of 'Peg' for any subsequent tours shall be mutually agreeable to both parties to this contract. J. Hartley Manners.
"Oliver Morosco."

### Second Contract.

"Whereas, J. Hartley Manners, of the city, county, and state of New York, party of the first part hereto, and Oliver Morosco, of Los Angeles, California, party of the second part hereto, have heretofore entered into an agreement, dated January 19, 1912 (hereinafter called 'original agreement'), a copy of which is hereto attached, and by express reference thereto made a part hereof, and controversies have arisen and now exist between the parties hereto with reference to the meaning of said original agreement, and the parties hereto desire to settle and adjust said controversies, and to change said original agreement as hereinafter set forth:

"Now, therefore, in consideration of the premises * * * the parties hereto do hereby enter into this supplemental agreement:

"First. The parties hereto do hereby settle and adjust all of said controversies.

"Second. Said original agreement, except as by this supplemental agreement changed, is hereby in all respects ratified, confirmed, and approved.

"Third. Paragraphs 'Sixth' and 'Eighth' of said original agreement, and also the addendum or postscript to said original agreement (which addendum or postscript bears the signatures of said Manners and said Morosco), are each and all hereby canceled and eliminated from said original agreement.

"Fourth. There shall be and there is hereby added to said original agreement the following, to be designated as new paragraph 'Sixth' thereof:

"'Said Morosco may, contemporaneously, and from time to time, as long as this contract is in force, produce, perform, and represent said play "Peg O' My Heart," with or in as many companies in the United States and Canada

as he, the said Morosco, may, in his sole discretion, deem proper; and it is further agreed that Laurette Taylor (Laurette Taylor Manners) need not be engaged to appear, and need not appear, in the title rôle, or star or principal part, or any other part in any of said companies, and that the said Morosco need in no way consult or confer with the said J. Hartley Manners respecting the star, the cast, the featured member or members of the cast, the rehearsals, or production of said play by any of said companies—of all of which the said Morosco shall have, and is hereby given, sole and exclusive charge and control.'

"Fifth. There shall be, and there is hereby, added to said original agreement, to be known as new paragraph 'Sixth-a,' the following:

" 'Said Morosco shall use reasonable efforts to direct that all advertising matter in the United States and Canada shall contain a reference to the fact that said Laurette Taylor was the creator of the rôle of "Peg" in said play; it being the intention of this provision that said Morosco shall use reasonable endeavors to have said Laurette Taylor's name featured in the manner above indicated, but it being expressly understood and agreed that said Morosco shall have the unlimited right and privilege to feature, star, and advertise any other person or persons appearing or to appear in any of said companies, in any manner that he, said Morosco, shall deem fit or proper.'

"Sixth. There shall be, and there is hereby, added to paragraph 'Fourth' of said original agreement the following provision:

" 'The royalties herein specified shall be paid to the said Manners by said Morosco at the rate herein set forth, for every company performing the said play of "Peg O' My Heart" in the United States or Canada, under the management of said Morosco, under said original agreement or this supplemental agreement.'

"Seventh. It is further agreed that paragraph 'Eleventh' of said original agreement shall be, and the same is hereby, amended so as to read as follows:

" 'Eleventh. Said Morosco is hereby expressly authorized to lease, sublet, assign, transfer, or sell to any person or persons, firm or corporation, whatsoever, any of his rights acquired under said original agreement or this supplemental agreement; it being expressly understood and agreed that no such leasing, subletting, assignment, transfer, or sale shall in any way release or discharge said Morosco from his personal liability to pay to said J. Hartley Manners the royalties in amounts, manner, and at the time as specified in said original agreement and in this supplemental agreement.'

"Eighth. It is further agreed that paragraph 'Twelfth' of said original agreement shall be and the same is hereby amended so as to read as follows:

" 'Twelfth. Said play "Peg O' My Heart" may be released for stock, in the United States and Canada, during the time that this contract is in force, whenever the net amount realized from all the companies producing the play in any one theatrical season shall yield a net profit of less than two thousand ($2,000) dollars. Whenever the said play is released for stock company or companies, the royalties received from the stock theaters shall be divided equally between the said J. Hartley Manners and said Morosco as and when received by said Morosco.'

"Ninth. It is further agreed that, during the period of four years from and after the date hereof, neither party hereto shall or will, without the written consent of the other party hereto first had and obtained, directly or indirectly produce, represent, or exhibit, or permit, allow, or suffer to be produced, represented, or exhibited, or sell, lease, give, or transfer, any permission, privilege, or right to produce, represent, or exhibit the said play by cinematograph or motion or moving pictures in the United States or Canada. It is further expressly understood and agreed that, after the expiration of said four-year period, the rights, whatever they may be, of either said Morosco or said J. Hartley Manners, to directly or indirectly produce, represent, or exhibit, or permit, allow, or suffer to be produced, represented, or exhibited, or sell, lease, give, or transfer any permission, privilege, or right to produce, represent, or exhibit, the said play by cinematograph or motion or moving pictures in the United States or Canada, shall be such as said Morosco and said J. Hartley Manners shall respectively be legally entitled to under and pursuant to the terms of said original agreement, to the said extent and

with the same effect as though this supplemental agreement had not been entered into. This provision is not to be construed as a recognition by either party hereto that the other had under the original agreement, or has under this agreement, the right to give or authorize the giving of cinematograph or motion or moving pictures of said play.

"Tenth. The said J. Hartley Manners and the said Morosco hereby forever mutually release the one the other from any and all claims and demands which either one now has or asserts, or might have or assert, against the other, for or on account of any alleged violation of said original agreement, on the part of either of the parties hereto, prior to the execution of this supplemental agreement. * * *"

Walter C. Noyes and David Gerber, both of New York City, for plaintiff.

Charles H. Tuttle and William Klein, both of New York City, for defendant.

MAYER, District Judge (after stating the facts as above). The suit is brought, in effect, to restrain defendant (1) from playing, producing, or controlling in any manner the dramatic composition "Peg O' My Heart," and (2) from manufacturing or presenting any motion picture based upon "Peg O' My Heart." The case requires only the construction of the two contracts; testimony in respect of customs and conversations antecedent to the contracts having been excluded.

[1] 1. Plaintiff urges that the first contract amounts only to a license, revocable at his option, except as to the interest of defendant for the period referred to in paragraph "Third" of the first contract, and that time, according to plaintiff, expired in June, 1918; a "theatrical season" concededly meaning from October to June.

Applying fundamental principles to the construction of this contract, it is entirely clear that the parties intended that defendant should have all the rights mentioned for all time and that paragraph "Third" (particularly when illuminated by paragraph "Fifth"), as aptly put by counsel for defendant, is a statement of the least that defendant is to do, not of the most he is to have. Had the parties otherwise intended, they could readily have fixed a time limit in paragraph "First" by the addition of words such as "for ———— years from" or "until" a stated date. The provision in paragraph "Eleventh" merely expressed, inter alia, the natural precaution of the playwright in preventing the disposition of the play to persons or corporations who might be distasteful or otherwise not satisfactory to the playwright. Whatever may be said as to paragraphs "Eleventh" and "Sixth," and the addendum, is now academic, in view of paragraphs "Third," "Fourth," and "Eleventh" of the second contract.

Indeed, the first contract in this respect was an entirely normal arrangement, which contemplated full right to defendant to produce the play as long as he deemed proper, provided that he would, in any event, give the play a fair trial and the opportunity for success which the minimum of 75 performances during the theatrical seasons covered by paragraph "Third" would develop.

[2] 2. I now come to what is the real controversy between the parties, viz. the motion picture rights. On this branch of the case, the question, simply stated, is whether the case at bar falls under Froh-

man v. Fitch, 164 App. Div. 231, 149 N. Y. Supp. 633, or Klein v. Beach (D. C.) 232 Fed. 240, and 239 Fed. 109, 151 C. C. A. 282. In the former case the contract recited: "Whereas," Frohman "desires the exclusive right to produce or to have produced the said play," and provided that Fitch "does sell" to Frohman "the exclusive right to produce the said play." In the case at bar, the contract recites: "Whereas," Morosco "wishes to obtain the exclusive right and license to produce, perform, and represent the said play," and provides that Manners "does grant" to Morosco "the sole and exclusive license and liberty to produce, perform, and represent said play."

It will thus be noted that the word "produce" occurs in both contracts; i. e., in Frohman-Fitch and in Manners-Morosco. When used alone, that word has a definite meaning, by virtue of Kalem Co. v. Harper, 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, and Frohman v. Fitch, supra, as was pointed out by Judge Learned Hand in Klein v. Beach, supra. In other words, "produce" includes the presentation in or by way of motion pictures. The scope of the word, as thus judicially defined, can be narrowed only by some other language, employed by contracting parties to express a different intent. Thus it was that the question in Klein v. Beach, supra, was whether the additional words "for presentation on the stage" and "on the stage," construed with their context, meant the spoken play.

Of course, it is often possible to find in the opinions of courts some sentence or phrase which, if isolated from its context, may convey a meaning different from what the writer intended. Opinions, however, must be read as a whole, and illustrative observations must be understood as applying only to the question and facts under consideration. Thus read, it will be found that the opinion of each court in Klein v. Beach, supra, simply held that the particular contract there considered contemplated the spoken play only.

In the case at bar, however, the decision need not rest solely upon particular words found in particular paragraphs. The whole structure of the contract demonstrates plainly the strength of defendant's position.

When the first contract was executed, motion pictures, as the parties agree and as the testimony shows, were well known. It is not controverted in this case that a motion picture of "Peg O' My Heart" would seriously damage, from a financial standpoint, the production of the spoken play. It is difficult to suppose that Morosco, as a producing manager, would risk the money necessary to produce the play at least 75 times each year for several years and leave the motion picture rights outstanding in Manners. In such a situation Manners might, at any time, for some reason satisfactory to himself, sell the motion picture rights and destroy the financial value of the spoken play. Indeed, the second contract discloses that controversies arose between the parties.

It might very well have happened that the play, instead of turning out a great success, might have had a run of short duration, with consequent lean royalties. Yet the production might have been salable for motion pictures at a price in excess of any royalties which failure as a

spoken play would indicate. In such circumstances, Manners could not lose. He would have, for himself, the proceeds resulting from his ownership of the motion picture rights, while Morosco would be compelled to pay him the stipulated per cent. of gross (not net) receipts derived from the compulsory performances required by paragraph "Third," and contemporaneously the financial results to Morosco might be gravely affected by the contemporaneous motion picture. In other words, Manners could not lose and Morosco was sure to lose, and practically the same result would follow if the play were released for stock. Courts are not astute to construe contracts with such a result, unless the language and intent clearly so require.

Per contra, if Morosco, by the contract, gained the motion picture rights, it is hardly conceivable that, while the spoken play was a success, he would destroy its financial future and possibilities by producing motion pictures contemporaneously, and thus destructively compete with himself.

Finally, that it was not intended to limit the scope of the production to any field of presentation is well evidenced by paragraph "Tenth" of the first contract. The express exclusion of the right to print and publish the play is clearly expressive of the intent to include all rights except those specifically excluded or reserved. The suggestion that paragraph "Seventh" has any bearing upon the question of motion picture rights is not persuasive, in view of the Kalem and Frohman v. Fitch Cases.

The bill is dismissed, with costs.