**G. RICORDI & CO. v. PARAMOUNT PICTURES, Inc.**

United States District Court
S. D. New York.

June 8, 1950.

Arthur E. Garmaize, New York City, for plaintiff.

Austin C. Keough, New York City, for defendant, Louis Phillips, Leonard Kaufman, New York City, of counsel.

CONGER, District Judge.

Motion by plaintiff for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. Defendant has cross-motioned for summary judgment dismissing the complaint herein on the merits on the ground that defendant is entitled to such judgment as a matter of law.

Both sides agree that the facts are not in dispute, and that they are established by written documents. Each side, however, draws different conclusions from the same written documents. I have examined the affidavits and exhibits submitted by the parties and I find no genuine issue as to any material fact.

The action is for a declaratory judgment and the plaintiff asks that it be adjudged to be the sole and exclusive owner of the motion picture rights of every nature and type in and to its copyrighted Opera Madame Butterfly and of all rights arising therefrom and that defendant be enjoined from claiming any interest in the title of the plaintiff to said motion picture rights. Other and incidental relief is asked for.

Defendant by its answer denies that the agreement upon which plaintiff bases its rights granted to plaintiff any motion picture rights. It affirmatively alleges in its answer that it acquired by various agreements the silent, sound, talking and all other moving picture rights in and to the story by John Luther Long and a dramatic version of that story by David Belasco, both entitled Madame Butterfly.

The term "motion picture rights" I understand to mean the silent, sound, talking and all motion picture rights of every type and nature. See L. C. Page Co. v. Fox Film Corporation, 2 Cir., 83 F.2d 196; Frohman v. Fitch, 164 App.Div. 231, 149 N.Y.S. 633.

In 1897 John Luther Long wrote and published a novel entitled "Madame Butterfly." It was published by the Century Company in its Illustrated Monthly Magazine, which issue of the magazine was copyrighted as a composite work by the Century Company in its own name.

In 1900 the Century Company granted to Belasco the right to dramatize said novel and in 1900 Belasco dramatized said novel by writing a one-act play based thereon which play was produced both in England and the United States.

On April 27, 1901, Belasco made an agreement with G. Ricordi & Company (plaintiff) whereby Belasco granted to plaintiff "the exclusive right for all countries of the world in all languages to make a Libretto for an opera of his dramatic version of Madame Butterfly, founded on the original theme written by John Luther Long."

The agreement provided for the delivery to the plaintiff of the original dramatic version by Belasco. The agreement is signed only by Mr. Belasco but incorporated in the agreement is a letter from Mr. Long that "Ricordi & Company may have Madame Butterfly for the Libretto of an opera to be composed by Puccini for $1250."

At the end of the agreement is a clause signed by plaintiff, Belasco and Long to the effect that Long & Belasco "are the owners absolute and have made no previous contract for an Operatic version of the said subject, Madame Butterfly."

Subsequently, and before the year 1904 plaintiff engaged Giacomo Puccini, Giuseppe Giacosa and Luigi Illica, who in collaboration wrote the Libretto, lyrics and words in the Italian language and music of three act opera Madame Butterfly.

During the year 1904 plaintiff caused its opera to be copyrighted in this country and in the year 1931 the son of Puccini renewed the copyright, which said renewal copyright was assigned to plaintiff.

Defendant bases its claims here through the author (Long) and the dramatist (Belasco). It will not be necessary for me to detail the various copyrights and renewals in the chain of title to Paramount. Paramount is the successor of several companies and since one or another of these companies was the grantee of rights in both the novel and the play, the defendant and its predecessor companies will be referred to generally as Paramount.

On November 5, 1913 an agreement was entered into between Long and Paramount. In and by this agreement Long granted to Paramount the sole and exclusive right to use his novel (Madame Butterfly) for moving picture purposes; the contract to terminate on May 1, 1918.

Pursuant to this agreement Paramount produced and released a silent moving picture entitled "Madame Butterfly" starring Mary Pickford.

On January 23, 1919 Long granted to Paramount the sole and exclusive right to exhibit the picture which had been produced previously and the right to produce another moving picture before January 1, 1924 with a seven year option which was not exercised.

On August 12, 1925 Long as author renewed his copyright to the novel Madame Butterfly. On April 15, 1932 the estate of Long granted and assigned to Paramount all the right, title and interest to the sole and exclusive rights with respect to the novel Madame Butterfly to make motion pictures with sound and dialogue, songs and music, and musical accompaniment in so far as the said grantee should have the right to use the same.

On the same date the widow of Long confirmed the grant made by the estate to Paramount and also granted and assigned to Paramount all her right, title and interest in the novel Madame Butterfly.

On May 11, 1932 Benjamin F. Roeder for himself and as trustee of the Belasco estate granted to Paramount and its assignees the motion picture rights in the play Madame Butterfly written by Belasco based on the story of the same title written by Long.

On May 13, 1932 plaintiff granted Paramount the nonexclusive, nonassignable right to record and re-produce by mechanical or electrical means in synchronism or timed relation with a talking or sound motion picture based upon or adapted from the story Madame Butterfly written by Long and/or the drama Madame Butterfly written by Belasco, specified excerpts from the opera Madame Butterfly by Puccini to be used instrumentally and without words in said motion picture.

Subsequently and during the same year this grant was extended to include other music from the Opera.

The primary issue to be resolved here concerns the agreement of April 25, 1901

between plaintiff and Long and Belasco. Does it carry with it in the moving picture rights to the Opera which was itself a new work and in entirely different form from the story and the drama although founded on the theme of the dramatic version by Belasco of the novel?

Defendant's position is well summarized by the following extract from its moving affidavit: "Plaintiff alone can grant the right to produce the opera on the stage or otherwise (but not on the screen). Paramount alone can grant the motion picture rights in the novel or the play, or both. But to produce a motion picture of the opera, both grants are necessary since Paramount owns the motion picture rights and plaintiff the music of Puccini's opera."

Plaintiff claims that based on its agreement with Long and Belasco it has the sole ownership of the moving picture rights flowing from the copyright of the opera Madame Butterfly.

In a controversy of this nature involving the construction of a written agreement one must try to ascertain the intention of parties in its making. Here, the original parties to the agreement have passed away. Neither side offers any proof dehors the agreement itself, except perhaps the conduct of the parties and as to this there is no dispute of fact.

From this source little help may be had. The conduct of the parties is susceptible of different interpretation. The agreement itself here is practically the only evidence of the intention of the parties.

■ I have come to the conclusion that the agreement evidences the intention on the part of Belasco and Long to give to plaintiff the right to create an entirely new work in the form of an Opera and that the copyrighted form of that Opera was to be the exclusive property of plaintiff. This agreement is more than a mere license. It is an assignment to plaintiff of all the rights of Belasco and Long of that part of their novel and play in so far as the creation of the Opera is concerned. The grant is absolute with no restrictions except that the source must be indicated.

The words of the grant are unequivocal. Among other things it gives to plaintiff the exclusive rights for all countries in the the world, in all languages to make a Libretto of Belasco's dramatic version of Madame Butterfly founded on the novel by Long, and "The said Libretto and *all rights therein dramatic and otherwise* to be the exclusive property of Messrs. G. Ricordi & Company for all countries of the world" and again "and further to have the *exclusive dramatic rights* of the said operatic version of the drama Madame Butterfly in any theatre of the world." (Italics added.)

I am convinced that the Opera Madame Butterfly finally created was a new work entirely separate in form at least from the drama and the novel, the theme being the feature in common.

■ The Opera Madame Butterfly is a valuable property. The Court may take judicial notice of its fame and of those who created it. It has been performed since 1904 in most of the important cities of the world.

Plaintiff copyrighted the Opera in 1904 in its name and has owned it and the renewal copyright ever since. Neither Long nor Belasco nor their successors may by means of motion pictures dramatize or perform the Opera, except with the consent of plaintiff. As I understand it, defendant does not claim such right, but does contend that plaintiff has not such right either, without the consent of the defendant.

At the time the agreement of 1901 was made there were two separate and distinct works with the theme of Madame Butterfly, (1) the novel by Long, and (2) the one-act play by Belasco. Plaintiff purchased from them the right to create a new work (an opera), founded on the same theme.

The grant was absolute, unconditional and without limitations (except for the use of the name of the author and the dramatist). It gave to plaintiff in addition the exclusive dramatic rights to the new work.

■ When this Opera was finally created it was the subject of copyright and was duly copyrighted. It was a substantially new and distinct composition. It was a

piece of property wholly separate and independent from the novel and drama. Edmonds v. Stern, 2 Cir., 248 F. 897.

█ It was held in Kalem Co. v. Harper Bros., 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas. 1913A, 1285 that moving picture rights are a form of dramatization.

In Photo Drama Motion Pictures Co. v. Social Uplift Film Corporation, D.C., 213 F. 374, at page 377 Judge Learned Hand wrote: "It was undoubtedly held in Kalem Co. v. Harper Bros., 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas. 1913A, 1285, that the owner of dramatic rights might forbid their dramatic representation by moving pictures, and to the present time the only right to protect moving pictures *arises from the words 'dramatic' or 'drama.'*" (Italics added.)

This same case was affirmed in 2Cir., 220 F. 448, 449, and the Court there said: "One Kauffman wrote a novel, entitled 'The House of Bondage.' He assigned his right to copyright the same to Moffatt Yard & Co. Moffatt Yard & Co. duly secured copyright. That gave them exclusive rights to publish and sell the novel; also to make dramatizations of it, whether in the usual form for acting on the stage of a theater, or in the more recent form of a motion picture play. Moffatt Yard & Co. assigned all dramatization rights to Kauffman. *He then had exclusive right to make dramatizations of either kind.*" (Italics added.)

█ So here Belasco and Long assigned to plaintiff in connection with the operatic version of the drama Madame Butterfly "the exclusive rights." I think this meant and does mean "the exclusive right to dramatization of either kind", and this, of course, would include moving picture rights.

█ Under this agreement plaintiff had the right to acquire a copyright under the statute which would give it an exclusive right to both an old time dramatization of the Opera and a motion picture presentation of the Opera. Photo-Drama Motion P. Co. v. Social Uplift Film Corp., 220 F. 448, supra.

█ There may be several dramatizations of the same story, each capable of being copyrighted. Harper & Bros. v. Kalem Co., 2 Cir., 169 F. 61.

Here we have two such dramatizations; the Belasco one-act drama and plaintiff's Opera. Each is separate and distinct from the other and each has its own dramatic rights (including moving picture rights). Neither may encroach on the other, but neither in my opinion is the one limited by the other.

█ It is no argument to say that when this agreement was made neither of the parties contemplated production of the Opera by moving pictures; that by the aid of science it has been possible to produce the Opera by means not contemplated when the contract was made does not give the defendant the right in any way to destroy plaintiff's property or diminish the value of what it produced. Frohman v. Fitch, supra.

In Harper Bros. v. Klaw, D.C., 232 F. 609 at page 613 Judge Hough in referring to movie rights under a contract made in 1899 stated that the movie rights to a certain work Ben Hur "undoubtedly existed in 1899, but in nubibus, or (what is frequently the same thing) in contemplation of law only. As a matter of fact they are an accretion or unearned increment conferred of late years upon the copyright owners by the ingenuity of many inventors and mechanicians."

I am finding here for plaintiff because of the broad and unequivocal language of the grant to plaintiff. My holding would be different were there any reservations in the agreement. Let me illustrate what I mean by the following quotations: "The case here presented is unlike some of those cited on appellant's brief, where the author of a book or of a play has assigned to someone all the dramatic rights thereto without reservation. Such an assignment conveys the right to acquire a copyright under the statute which will give an exclusive right to both an old-style dramatization and the modern variant, a motion picture presenta-

tion of the drama." Photo Drama Motion Picture Co., Inc., v. Social Uplift Film Corporation, 2 Cir., 220 F. 448, at page 450.

The above quotation very aptly points to the distinguishing of the cases cited by defendant in support of its contention on this point. It will not be necessary for me to refer to each and every one of them. They are of a pattern. The agreements construed in defendant's cases are so circumscribed by reservations and conditions that one can only conclude that moving picture rights were never within the contemplation of the parties.

For instance, take Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 336, 64 L.Ed. 590. The Court was there construing the rights of the parties in connection with two agreements to produce a play made in 1912 and 1914. In the opinion Mr. Justice Holmes stated: "The thing granted was 'the sole and exclusive license and liberty to produce, perform and represent' the play within the territorial limits stated, subject to the other terms of the contract. It may be assumed that these words might carry the right to represent the play in moving pictures if the other terms pointed that way, but to our mind they are inconsistent with any such intent. * * * Every detail shows that a representation by spoken drama alone is provided for." Then follows a list of the details upon which the Court based its conclusion.

Here we have "no other terms" or "details" pointing to a contrary conclusion than that urged here by the plaintiff.

Defendant claims that plaintiff's conduct since 1901 indicates that it never believed it had acquired motion picture rights in Madame Butterfly and that its course of conduct in standing by while two motion pictures were produced by Paramount and by its grants to Paramount of music rights for a talking moving picture it acknowledged that it never acquired motion picture rights in Madame Butterfly and recognized demonstrably that such rights were vested in Paramount.

I cannot see that these contentions of defendant have any merit. It is true apparently from the record before me that plaintiff never exercised its now claimed movie rights in the Opera, until perhaps 1946 when it was reported in trade papers that it had sold such rights. There was no reason for it to proclaim to the world that it claimed such rights for during all these years it does not appear that any one resisted the claimed rights of plaintiff. It could, therefore, rest on its rights.

There was no obligation on plaintiff's part to object to the production of the two motion pictures by defendant. These were based on the novel and the Belasco play. Were they based on the Opera and plaintiff acquiesced the story would be different.

It does appear from the affidavits that this suit was started within about four months after plaintiff had been informed by letter from defendant that Paramount was claiming moving picture rights in the Opera Madame Butterfly. No inference may be claimed here against plaintiff because for a consideration it granted to Paramount the right to use certain of the music of the opera in connection with a talking movie. It was a very limited license to use only certain music from the Opera. It was a non-exclusive and non-assignable license. One might very well draw the opposite inference that defendant recognized that plaintiff had an interest in the Opera paramount to that of plaintiff.

Defendant also claims that plaintiff's rights, if any, expired in 1925 with the original term of the copyright in the Long novel. What I have said before I think disposes of this contention. If I understand defendant's claim in this respect it is that plaintiff has no rights of any kind in the Opera. Defendant's other arguments are not consistent with this claim. The Opera, as I have stated, when completed was duly copyrighted. Certainly this copyright does not expire before the legal time and is not dependent upon the life of the copyright of the basic work.

Defendant further claims that plaintiff's license to defendant to use some of the music of the Opera in a moving picture precludes it from granting to any one

else the right to make a motion picture of its Opera. I cannot agree with defendant in this contention. The license to defendant by plaintiff was specific and for a limited purpose. Defendant paid just for what it got, a non-assignable and *non-exclusive* license to use in connection with a talking moving picture certain music of the Opera. The license agreement is not ambiguous but specific as to what was conveyed. By no stretch of the imagination may it be said that plaintiff by express agreement or by implication barred itself by the granting of this *non-exclusive* license from itself making a moving picture of its Opera or granting to some one else the right to do so.

I think I have disposed of all of defendant's contentions. I have at least discussed those contentions of defendant which I felt had real merit.

 The solution of this issue was not an easy task. I do feel, however, that the interests of plaintiff and defendant are not in conflict; that plaintiff under the agreement of 1901 is entitled to exercise all the rights the copyright of the Opera vested in it, including the moving picture rights in the Opera, and that defendant has the moving picture rights and any other rights in Long's novel and Belasco's play, minus any rights in the plaintiff's Opera and plus any rights given to it by the license from plaintiff to use certain of the music of the Opera in connection with a talking moving picture.

 Judgment for plaintiff as prayed for in the complaint with costs, except that I do not feel that defendant should be required to pay the reasonable attorney's fees of plaintiff.

There is nothing before me either as to the claimed damages to plaintiff.

If plaintiff is claiming damages this matter should be taken up with me when the decree is settled.

Settle decree on notice.