## MANNERS v. MOROSCO.

### (Circuit Court of Appeals, Second Circuit. April 16, 1919.)

### No. 201.

1. COPYRIGHTS ⟨key⟩50—CONTRACTS—CONSTRUCTION—CONTRACT GRANTING RIGHT TO PRODUCE PLAY.

A contract by which the author of a play granted to another "the sole and exclusive license and liberty to produce, perform and represent" the play in the United States and Canada, and in which the grantee agreed to continue the play "for at least 75 performances" during the ensuing season and "for each theatrical season thereafter for a period of five years," and that, if during any one year the play had not been produced for 75 performances, his rights should cease and determine and revert to the grantor, *held* not to terminate at the end of five years, but to continue in force so long as its obligations were performed by grantee.

2. COPYRIGHTS ⟨key⟩50 — CONTRACTS — CONSTRUCTION — CONTRACT GRANTING RIGHT TO PRODUCE PLAY—ASSIGNMENT OR LICENSE.

An agreement for production rights in a play binding the parties, heirs, executors, assigns, administrators, and successors, is an assignment and not a mere license.

3. COPYRIGHTS ⟨key⟩50 — CONTRACTS — CONSTRUCTION — CONTRACT GRANTING RIGHT TO PRODUCE PLAY.

A contract granting "the sole and exclusive license and liberty to produce, perform and represent" a play, *held* to carry the motion picture rights.

Ward, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by J. Hartley Manners against Oliver Morosco. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 254 Fed. 737.

Certiorari granted 249 U. S. ——, 39 Sup. Ct. 494, 63 L. Ed. ——.

Walter C. Noyes and David Gerber, both of New York City, for appellant.

William Klein and Charles H. Tuttle, both of New York City, for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge [1] The appellant is the author of "Peg O'My Heart." He is the husband of Laurette Taylor, the star of that very successful play as dramatized.

On January 19, 1912, the parties entered into a contract which in part provided and granted to the appellee "the sole and exclusive license and liberty to produce, perform and represent the said play in

the United States of America and the Dominion of Canada." The third paragraph provided:

"The party of the second part (appellee) agrees to produce the play not later than July 1, 1913, and to continue the said play for at least 75 performances during the season of 1913–1914 and for each theatrical season thereafter for a period of five years."

The fifth paragraph provides:

"That the said party of the second part (appellee) further agrees that if during any one theatrical year such year to begin on the first day of October, said play has not been produced or presented for 75 performances, then all rights of the said party of the second part shall cease and determine and shall immediately revert to the said party of the first part."

After the contract was made, the play was produced and ran continuously and successfully for a period of 74 weeks up to May 30, 1914, in New York, with Laurette Taylor in the star part. On July 20, 1914, the parties entered into an agreement modifying in some respects the agreement of January 19, 1912. By the modification, arrangement was made for the production of the play without Laurette Taylor in the star part and for other productions in more than one company. It was further provided that the appellee be permitted to lease, stipulate, assign, transfer, or sell to any one, any of his rights under either contract. And it was specifically covenanted that the issue now presented between the parties as to the ownership of motion picture rights was to be determined by reference to the original contract. After the execution of this contract, a number of companies gave performances in various parts of the United States and Canada. Payment under the terms of the contract was duly made to the appellant.

When the theatrical season of 1917–1918 expired, the appellant, claiming that the appellee no longer had any interest in any of the producing rights, brought this action to restrain further production of the play by the appellee, both on the stage and in motion picture form. Two questions are presented by counsel on this appeal: First, the date, if any, of the termination of the contract; and, second, whether the appellee under the contract is entitled to the motion picture rights.

It is claimed by the appellant that only a license, revocable at his option, was contracted for with the appellee under the third paragraph of the first contract, and that the contract expired at the end of the theatrical season in May, 1918. But that is not what was contracted for. It was not an agreement for personal service or for a mere license, but was a bargain and sale of the sole and exclusive right to produce, perform, and represent the said play in the United States and Canada. Property was thereby granted and conveyed. It may be intangible, but it has a value and is the subject of proprietorship. It is not a conveyance which is revocable at will or for a temporary period, but for the time provided for in the terms of the contract.

The third paragraph is a covenant setting forth the least that the appellee would do in performing the contract. In other words, it sets forth the appellee's assurance of his bona fide endeavor or attempt to

make the play a success and thus secure to the appellant some substantial royalties. A mere reading of the paragraph will indicate that the parties fixed a minimum and not a maximum of endeavor on the part of the appellee to make for success. It is not an agreement of the most that the appellee agreed to do to make for success. In this connection, the fifth paragraph must be considered and read with the third paragraph. Plainly, if the appellee had failed to present 75 performances of the play "during any one theatrical year," then all rights of the appellee ceased and determined and the play reverted to the appellant. There is harmony between the first and third paragraphs and the intent of the parties that the appellee's rights should not be limited to any definite period is quite plain. The grant was perpetual if the obligations of the contract, particularly paragraphs 3 and 5, were complied with.

[2] The modified contract made on July 20, 1914, reaffirmed the first contract and provided in the ninth paragraph that, at least four years after its date, the original contract was still in force, as a conveyance of all the production rights, and that neither party would produce the play in motion picture form without the consent of the other and until such time, when, after the expiration of four years, the question of motion picture rights should be determined pursuant to the terms of the original agreement.

This clearly negatives the claim of the appellant that under the third paragraph the contract expired after five years from January 19, 1912. An agreement for production rights binding the parties' heirs, executors, assignees, administrators, and successors, is an assignment and not a mere license. Photo Drama Motion Picture Co. v. U-Film Corp. (D. C.) 213 Fed. 374, affirmed 220 Fed. 448, 137 C. C. A. 42.

Since the contract is not revocable by will by either party or otherwise limited as to its duration by its express terms or by the inherent nature of the contract itself with reference to its subject-matter, it is presumably intended to be permanent or perpetual in the obligation it imposes. Western Union Telegraph Co. v. Penn. Co., 129 Fed. 849, 64 C. C. A. 285, 68 L. R. A. 968.

[3] In determining the production rights conveyed, whether it included the right to produce in motion picture form or not, we must confine our study to the contract itself. The intention of the parties must be secured from the language employed in the instrument itself. Such intention means the accepted reasonable and judicial settled content of the words employed. If the parties have erred in the use of the words, this kind of action cannot grant relief. The words employed, "the sole and exclusive license and liberty to produce, perform and represent the said play," have received judicial construction. A motion picture performance is a stage representation of the play and violative of the rights of an owner of the exclusive right of production. Frohman v. Fitch, 164 App. Div. 231, 149 N. Y. Supp. 633.

Ordinarily, one may "produce or perform" a spoken play upon the stage, but "to represent" seems to be peculiarly appropriate to a motion picture representation of a play. Dramatic rights were held to include the motion picture rights in Frohman v. Fitch, supra, in the

absence of other words narrowing the meaning of the contract. An author of dramatic composition is protected by section 4952 of the Revised Statutes of the United States as to not only the sole right of printing it, but also the sole right of "publishing, performing or representing it or causing it to be performed or represented by others." Nor need we be confined in our determination to a strict legal use of the words employed as heretofore judicially determined. It is apparent that the parties intended the results here pronounced. We think the parties intended a conveyance of the entire right to place the play before the American public in any form. It seems inconceivable that the parties intended to reserve to the appellant the right of production in motion picture form when they gave no such expression of reservation in the language of the contract, and particularly when the language employed indicated a comprehensive grant of all producing rights.

In paragraph 10 of the first contract, the author reserved the right to print and publish the play, but his right was not to be exercised within six months after the production of such play in New York City unless by written consent of the manager. So, too, reservations were made as to leasing and sub-letting the play. By the tenth paragraph, the author reserved the right of publication in book form.

An expression in the contract of one or more things of a class implies the exclusion of all not expressed, although all would have been implied had none been expressed. 13 Corpus Juris, 537.

In view of what appears in this record of the cost and expense of successfully dramatizing this play and what appears to be a lucrative contract resulting to the appellant, this court should be reluctant to give a construction not warranted by the language nor intended by the parties, which would permit of competition by the appellant in the production of this play in motion pictures. Frohman v. Fitch, 164 App. Div. 231, 149 N. Y. Sup. 633.

Appellant, however, says that Klein v. Beach, 239 Fed. 108, 151 C. C. A. 282, supports his views. In that case, it was recited, "whereas the manager wishes to engage the services of the author to dramatize the said book for presentation on the stage," and the novelist granted to the author "the sole and exclusive right to dramatize the said book for presentation on the stage," and the parties agreed to grant to the manager "the sole and exclusive license and liberty to produce, perform and represent the said play or dramatic composition on the stage," the right to dramatize the novel for presentation on the stage was held not to carry the right to produce in motion pictures. This court, in considering Klein v. Beach, supra, said:

"The turning point in this case, is the scope of the grant, whether by its terms it conferred upon Klein dramatic rights in the larger sense including presentation, not only by living actors, but also by motion pictures, or whether it was limited to the 'stage' proper."

This court approved Frohman v. Fitch, supra, and upon the authority of Kalem v. Harper, 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285, stated that the dramatic rights included motion picture rights, but such a conveyance of dramatic rights to have

such meaning cannot be narrowed by other limitations. In Klein v. Beach, supra, stage rights only were granted, and this was made plain in the preamble and the provisions of the contract. This court there said in so holding: "In general it is quite clear that this was the prevailing purpose of the parties."

In the case at bar, no distinction is made between the producing rights which the appellant had and those which he conveyed, except where the parties themselves defined it, such as in paragraph 10, to wit, reserving the right to publish the play in book form under conditions there expressed.

We find no error in excluding the contract with Laurette Taylor. This was a contract for the services of Laurette Taylor to perform as a leading female character, not only in this play, but in other plays that might be suited to her talent and ability. It provided for a three-year period with an option of three more. It was no evidence indicating a limitation upon the contract between the parties to this litigation and was properly excluded.

The identity of the person who drew the agreement of January 19, 1912, was unimportant. The contract was bilateral. Responsibility for ambiguity in a contract should be borne by the party who caused it, but there is no ambiguity. It was not important to know the identity of the party who drew the contract.

Holding these views as we do, the decree must be affirmed.

WARD, Circuit Judge (dissenting in part). The grant in the contract under consideration is of an exclusive right "to produce, perform and represent" a play. There has been no judicial construction of any of these words so as to make them technical without reference to the terms of some particular contract. Harper Bros. v. Kalem Co., 169 Fed. 61, 94 C. C. A. 429 (Kalem Co. v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285), was not a case of contract but of infringement of copyright, the question being whether a moving picture show was a dramatization of an author's work. In Frohman v. Fitch, 164 App. Div. 231, 149 N. Y. Supp. 633, the exclusive right to "produce" a play was construed in the particular contract to cover moving picture rights, whereas in Klein v. Beach, 239 Fed. 108, 151 C. C. A. 282, we held the grant of an exclusive right to "produce, perform and represent" a play "on the stage" did not cover moving picture rights. The other words "perform and represent" in that contract and in the contract now under consideration have appeared in our Copyright Act since 1870 (U. S. Rev. Stat. 4966), long before moving picture shows were dreamed of. Therefore the question is: When the parties used the words "produce, perform and represent" the play, what were they intending to cover by those words? It seems to me perfectly plain from the contract that they were intending to cover the spoken play only and, if so, the words they used, however large, must be confined to the thing they were contracting about.

The third article of the contract speaks of theatrical seasons, which exist for spoken and do not exist for movie plays.

258 F.—36

The fourth article provides for royalties on the gross weekly receipts of the box office, which was held in Harper Bros. v. Klaw (D. C.) 232 Fed. 609, 612, to be inapplicable to "any method of photoplays in commercial use or known to witnesses or counsel." The trial judge refused to permit the plaintiff, over his objection and exception, to prove this fact.

The fifth article refers again to theatrical seasons.

The sixth article provides for the production of the play in first class theaters and on the road with Miss Taylor in the title rôle, which applies in my judgment to the spoken play only.

The eighth article provides that the rehearsals and productions shall be under the author's direction, which does not apply to movie shows.

The eleventh article provides that should the play fail in New York or on the road it should be released to stock theaters, which applies to the spoken play only.

On the other hand, I find not a word in the contract indicating an intention to transfer the movie rights though they were perfectly well known by both parties. Therefore though the words of the grant are large enough to cover them, I think the words are to be restricted to what the parties were contracting about, viz., the spoken play.