**VIACOM INTERNATIONAL INC. et al., Plaintiffs,**

v.

**TANDEM PRODUCTIONS, INC., Defendant.**

No. 73 Civ. 2941 MIG.

United States District Court, S. D. New York.

Jan. 4, 1974.

Hughes, Hubbard & Reed, New York City, for plaintiffs; Otis Pratt Pearsall, James F. Parver, New York City, Allan J. Kasen, New York City, of counsel.

Shea, Gould, Climenko & Kramer, New York City, for defendant; Milton S. Gould, Joseph Ferraro, New York City, of counsel.

GURFEIN, District Judge:

On July 5, 1973 Viacom International Inc. ("Viacom") and certain of its subsidiaries commenced this action, based upon diversity of citizenship, against Tandem Productions, Inc. ("Tandem") to vindicate and protect against threatened irreparable injury Viacom's alleged exclusive license to distribute off-network the television series "ALL IN THE FAMILY." Viacom is the successor to the syndication and distribution business of CBS Enterprises, Inc. ("CBS Enterprises"), a former subsidiary of Columbia Broadcasting System, Inc. ("CBS"). This business includes the domestic rerun distribution of television programs after their network run is completed, and the foreign distribution of such programs contemporary with network broadcast. On June 4, 1971, in a spin-off transaction specifically approved by the Federal Communications Commission ("FCC"),[1] CBS Enterprises merged into Viacom, CBS assigned to Viacom whatever rights it possessed or acquired to distribute television programs in syndication, and Viacom's stock was distributed by CBS to its shareholders.[2] Tandem is in the business of producing television programming, and is the packager of ALL IN THE FAMILY.

The complaint charges Tandem with violation of Viacom's exclusive right, as assignee under an agreement between Tandem and CBS, to distribute ALL IN THE FAMILY in syndication both in the United States and abroad. Among other matters, it alleges that Tandem has acted to prevent Viacom from obtaining the tapes and other materials needed to continue its foreign distribution of the series and further, to cause

---

1. In re Columbia Pictures Industries, Inc., 30 F.C.C.2d 9, aff'd sub nom., Iacopi v. F.C.C., 451 F.2d 1142 (9 Cir. 1971).

2. Block tr. 244–45, 257; Ex. 410.

third parties to undertake such distribution in Viacom's place. The primary relief sought is a declaration of Viacom's contract rights, and an injunction against Tandem's further breach of or interference with such rights.

Upon filing the complaint plaintiffs moved for a preliminary injunction and, in conjunction therewith, sought a temporary restraining order. The Court suggested a "stand-still" stipulation, approved by the Court on July 9, 1973, under which each side undertook to refrain from specified market activities pending the preliminary injunction hearing set for July 23, 1973. Similarly, action on the preliminary injunction motion was deferred when at the hearing on July 23 the parties agreed to continue the stand-still stipulation and, in addition, Tandem consented to allow CBS to make available to Viacom the materials required to service two contracts with broadcasters in Finland and Holland. The parties agreed to combine the preliminary injunction hearing with a full trial on the merits, which the Court scheduled to commence on September 17, 1973. Fed. R.Civ.P. 65(a)(2).

In the course of the proceedings on July 23, 1973 the Court had determined that CBS was an indispensable party. Plaintiffs thereupon served CBS with a summons and Second Amended Complaint naming CBS a defendant, and asked the Court to realign CBS as a plaintiff. CBS countered with a motion seeking *inter alia* an order dismissing the action as to CBS and directing the other parties to interplead. It represented that it had no interest in the tangible and intangible property at issue in the action, and offered to hold any such property for disposition as directed by the Court. Prior to commencement of the trial, the Court determined that CBS was a stakeholder and signed an order dismissing CBS as a party and converting the suit into an interpleader action.

On August 13, 1973 Tandem served its answer, alleging as a "Fifth Defense" that the agreement between Tandem and CBS on which plaintiffs' claims are founded was void as violative of the antitrust laws. Plaintiffs moved under Fed.R.Civ.P. 12(c), 12(f), 12(h)(2) and 56 to strike the defense as insufficient and for summary judgment thereon. The Court heard argument prior to trial on September 17, 1973, and reserved decision, suggesting that Tandem file a written offer of proof in support of its Fifth Defense and that plaintiff file a written objection to such proof on grounds of relevance. This was to permit the Court to decide whether the antitrust defense was available, without the necessity of first taking extended testimony on the antitrust defense.

The trial took place on September 17 through 20 and on October 4, 1973. Each side introduced the testimony of witnesses, deposition testimony, and documentary exhibits.

The plaintiff seeks a judgment declaring that it has the exclusive domestic syndication and foreign distribution rights to ALL IN THE FAMILY, pursuant to an agreement between CBS and Tandem, the aforesaid rights having been assigned to it. It also seeks a permanent injunction against Tandem's wrongful interference therewith. CBS holds the video tapes and other material which a distributor requires to make prints which it can license for television performance. On the representations of Tandem, CBS has refused to give Viacom the tapes, treating itself as a mere stakeholder. Viacom contends that a continuation of Tandem's alleged wrongful conduct is not adequately compensable in money damages.

Viacom takes the position that: (1) Tandem granted CBS an exclusive license to distribute the program in syndication, and that CBS assigned its license to Viacom; and (2) Tandem's conduct wrongfully interfered with Viacom's exclusive rights, requiring injunctive relief as a remedy.

Tandem defends, with unusual ingenuity of counsel, on a broad front. It argues that (1) the purported assign-

ment of syndication rights by CBS to Viacom was not an assignment of rights, but an attempted delegation of duties which could not be effective without Tandem's ·consent; (2) there was no binding contract between CBS and Tandem with respect to distribution until after such a contract was prohibited by the FCC regulations under the "financial interest" rule, later explained; (3) the syndication rights were, in fact, never assigned by CBS to Viacom; (4) the exclusive distributorship created by the CBS–Tandem agreement was terminable at will; and (5) the exclusive distributorship agreement was terminable for failure of consideration.

In addition, Tandem, in its answer has asserted its Fifth Defense that Tandem was coerced because of CBS' power as a major network into giving the exclusive distributor's rights to CBS in violation of the antitrust laws, and that, hence, the agreement cannot be enforced by CBS, or by its assignee, Viacom. Viacom, before trial, had moved for summary judgment dismissing the Fifth Defense. I reserved decision, as indicated above, and permitted Tandem to make an offer of proof at trial, for later determination by the Court whether, assuming those facts, Tandem had a valid antitrust defense to the action. The antitrust defense will be discussed below.

### The History of
### "ALL IN THE FAMILY"

In May, 1970 negotiations with respect to this program began between CBS and Tandem, a company owned by Norman Lear and Alan Yorkin. "ALL IN THE FAMILY" is based on an English television show, " 'TIL DEATH US DO PART." The owner of the British copyright, Johnny Speight, gave Tandem as of July 1, 1970 a license under the British copyright, with the right to sublicense CBS distribution in the United States, and certain other territories.

CBS, in the name of Tandem, secured and registered, in addition, a federal copyright for each episode. At the time of the CBS–Tandem negotiations, however, foreign territories, which had been licensed under the British copyright had not been cleared for exploitation under the Tandem license to CBS.

The negotiations between Tandem and CBS in June-July, 1970 resulted in an oral agreement, later memorialized in a written contract, dated "as of July 10, 1970." I find that the essential points of the oral agreement were: (1) The network broadcast of "ALL IN THE FAMILY" would begin either in January, 1971 or in the Fall of 1971, at CBS' option. (2) The term of the network broadcast would be five years or five and a half years, depending on when the broadcasts actually began; after the term CBS was to have first negotiation—first refusal rights. (3) The license fee was fixed for each new episode, with CBS absorbing "below the line" expenses above a specified amount up to a specific maximum per episode.[3] (4) There was a fixed license fee for repeat episodes. (5) There were specific annual license fee escalations. (6) Tandem was protected from union increases by license fee adjustments "effective from and after July 10, 1970," and CBS was to hold down "below the line" costs by pegging the charges for its services to its current rate card. (7) CBS was to advance certain pre-production expenses, subject to recoupment. (8) Certain pre-production moneys were also to be paid by CBS on a non-recoupable basis. (9) CBS committed itself for a minimum of 13 episodes. (10) CBS' right to continue each succeeding year was conditioned on its having ordered at least 22 new programs during the previous year. (11) For subsequent years of the term CBS was committed to order a minimum of 16 episodes. (12) Tandem agreed that CBS shall have all syndication and distribution rights, and

---

3. "Below the line expenses" is a term of art in the motion picture and television industry. Generally, these are actual production costs,

as distinguished from the cost of screenplay, actors, director, etc. which are "above the line" expenses.

that CBS would deduct its distribution expenses and standard syndication fees (40% for domestic sales, 40% for foreign sales, 25% for regional sales and 10% for network sales), and remit 100% of the net profits to Tandem. CBS also agreed to give Tandem $16,000 toward liquidating a liability to ABC, with the understanding that Tandem would use its best efforts to clear the uncleared foreign territories.[4] (13) Tandem retained the merchandising rights, with a 15% profit participation to CBS. (14) Norman Lear was to produce, stage, and "head write" the program, and later become executive producer. (15) Lear was to receive a payment from CBS for "standing by," if CBS elected to defer the series.[5]

There was no discussion of an assignment clause in June-July 1970. In the final agreement between CBS and Tandem, executed on July 22, 1971 "as of July 10, 1970," there is, however, an assignment clause reading as follows:

> "CBS may assign its rights hereunder in full or in part to any person, firm or corporation provided, however, that no such assignment shall relieve CBS of its obligations hereunder."

The plaintiff contends that the subject-matter orally agreed upon by July, 1970 constitutes a binding agreement. The defendant relies on the well-known doctrine that if a material element of a contemplated contract is left for future negotiation, the contract is unenforceable. Willmott v. Giarraputo, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); Ansorge v. Kane, 244 N.Y. 395, 155 N.E. 683 (1927).

It relies on the existence of certain "material open items" to support its legal proposition that there was no contract on July 10, 1970. These are: (1) whether Canada would be included in the network broadcast area; (2) how much CBS would control the content of the programs; (3) whether it was clear what was meant by CBS' "standard fees" for distribution; (4) whether CBS would reimburse Tandem for the cost of the "black family;"[6] (5) and whether the agreement would be assignable.

■ I find that none of these was so material as to permit a finding that the agreement was to be held in abeyance until they were resolved. The evidence establishes that within thirty to sixty days following the negotiation in June, 1970, there was a meeting of the minds on all fundamental matters.[7]

(1) Whether CBS was to get Canadian network broadcast rights without payment of additional license fees was discussed, but apparently resolved in favor of Tandem. In any event, the Canadian network broadcasting was a relatively minor appendage to the whole deal. (2) The control of programming by CBS was not left open; the parties apparently came to a sensible agreement about it, providing that the program would ridicule the far "left" as well as the far "right."[8] (3) CBS' "standard fees" for distribution were well-known and required no spelling out by percentage figures. (4) With regard to payment by CBS for the black family, Mr. J. William Hayes of Tandem acknowledged that its ultimate solution represented an adjustment (in

---

4. Domestic syndication is the licensing of television programs for broadcast to stations on a market by market basis as opposed to an electronic distribution which takes place when a program is fed into a network. International syndication is the licensing of television programs to broadcasters around the world. It includes foreign networks. (Block tr. 243).

5. See memorandum of Cohn to Lear, June 25, 1970, Ex. 76; Ex. 87.

6. The "black family" was an essential element in the program idea of exposing the protagonist's ludicrous racism.

7. Samuel Cohn, Executive Vice-President of Tandem's agent, Creative Management Associates, addressed a memorandum on June 25, 1970 to Mr. Lear summarizing the CBS proposal (Ex. 76).

8. See Lear Dep. 110.

March 1971) ". . . to the previously existing agreement . . ."[9]

■ With respect to the right of CBS to assign its domestic syndication and foreign distribution rights, I find that there was no discussion of this matter in 1970, and that there was no right to assign expressly given to CBS by Tandem in 1970. The lack of an assignment clause did not, however, prevent the agreement from becoming a binding agreement.

Mr. Lear began working on the production in July-August, 1970.[10] Lear and his staff moved into the CBS offices in September or October, 1970.[11] In December, 1970 and January, 1971 efforts were made to clear foreign territories for syndication.[12] The parties proceeded to produce and broadcast; to incur costs and to pay license fees.[13]

■ When, in July of 1971, CBS and Tandem entered into the written agreement "as of July 10, 1970", the assignment clause was made a part of it. When a written contract provides that it shall be effective "as of" an earlier date, it generally is retroactive to the earlier date, Mutual Life Ins. Co. v. Hurni Packing Co., 263 U.S. 167, 175–176, 44 S.Ct. 90, 68 L.Ed. 235 (1923); Brewer v. National Surety Corp., 169 F.2d 926, 928 (10 Cir. 1948); Matthews v. Jeremiah Burns, Inc., 205 Misc. 1006, 1013, 129 N.Y.S.2d 841 (Sup.Ct. N.Y. Co.1954). Hence an assignment made at any time after July 10, 1970 would be effective under the contract, if validated by such contract.

■■ Tandem argues, however, that the oral contract I have now found to exist, cannot be effective, in any event, because the parties contemplated that there would be no binding agreement until there was a formal agreement embodying the terms. It is true that "[w]here a written agreement is contemplated, a mere oral understanding is insufficient, in the absence of proof that the parties intended to be bound by it." Rosenzweig v. Salkind, 5 A.D.2d 58, 169 N.Y.S.2d 213 (1st Dept. 1957). See Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65 (1962). On the other hand, where parties have reached an agreement, it will be given effect unless it is shown that they do not intend to be bound until the execution of the formal writing. V'Soske v. Barwick, 404 F.2d 495, 499 (2 Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Tymon v. Linoki, 16 N.Y.2d 293, 299, 266 N.Y.S.2d 357, 213 N.E.2d 661 (1965); Sanders v. Pottlitzer Bros., 144 N.Y. 209, 39 N.E. 75 (1894). Here I can find no such intention. There was evidence that in the broadcasting industry, as in the motion picture industry, agreements reached are often reduced to writing after they have been already performed in whole or in part.[14] The production and broadcast of the first season of ALL IN THE FAMILY, without a written contract, is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument. Eggers v. Armour & Co., 129 F.2d 729, 732 (8 Cir. 1942); Newburgh v. Florsheim Shoe Co., 200 F.Supp. 599, 602 (D. Mass.1961); 1 Williston, Contracts (3d ed. 1957) § 28A. If CBS had breached its obligation to continue the broadcasts, Tandem would have had the right, in my opinion, to maintain that there was a binding obligation.

9. Ex. 29.

10. Lear Dep. 133–34; 151–52.

11. Lear Dep. 141–42.

12. Exs. 114, 115, 116, 22, 48; see also Exs. 34, 35.

13. The lawyers apparently ground out their product more slowly than did the cameras.

It was not the lawyers' fault. While these business dealings were ongoing, no one appeared to have time to give the lawyers instructions for formalizing the agreement of the parties.

14. Sipes tr. 214–15; Yorkin Dep. 36–37; Lear Dep. 48.

■ The foregoing finding that there was an oral contract between CBS and Tandem in about July, 1970 has significance in two aspects of the case at bar. Tandem contends that (1) the contract did not become effective until *after* an FCC regulation had made it illegal; and (2) even if there was a binding agreement in July, 1970, it was not in the contemplation of Tandem, in making its bargain with CBS, that CBS would have the right to assign its duties under the syndication and foreign distribution agreement to the plaintiff, Viacom.

To put the matter in proper perspective, the story of the FCC regulation must be told briefly: On May 4, 1970 the FCC adopted a rule (the "financial interest rule") which became effective on October 1, 1970 and which prohibited any television network from acquiring after that date any ancillary interest in a television program, such as the exclusive license to distribute ALL IN THE FAMILY in syndication. Contending that the agreement under which CBS acquired such license was not concluded until after October 1, 1970 Tandem asserts that such acquisition violated the financial interest rule and was therefore void.

Even had the financial interest rule become operative on October 1, 1970 as Tandem alleges, it would have been inapplicable to the transaction in issue, for I have found that there was a binding agreement for syndication between CBS and Tandem in the summer of 1970. In fact, however, the "financial interest rule" did not become operative until July 23, 1971.

The financial interest rule is paragraph (j)(1)(ii) of Section 73.658 of the FCC's Rules and Regulations with Respect to Competition and Responsibility in Network Television Broadcasting.[15]

As originally adopted, the rule provided in pertinent part:

"(j) *Network syndication and program practices*

"(1) Except as provided in subparagraph (3) of this paragraph, no television network shall:

. . . . . .

"(ii) after September 1, 1970, acquire any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part by a person other than such television network, except the license or other exclusive right to network exhibition within the United States and on foreign stations regularly included within such television network . . . " (Report and Order, 23 F.C.C.2d 382, 402 (1970))

On August 21, 1970 the FCC announced an amendment of the financial interest rule changing the date after which such rule was to become operative from September 1, 1970 to October 1, 1970. 35 Fed.Reg. 13650 (1970).

On August 10, 1970 Mount Mansfield Television, Inc. filed in the United States Court of Appeals for the Second Circuit a petition for review of the financial interest rule, among others, and in due course this proceeding was consolidated with several similar proceedings.[16] On October 19, 1970 the Court of Appeals for the Second Circuit issued three virtually identical orders in these proceedings, providing that:

" . . . A stay of the effective date of the financial interest rule, section 73.658(j)(1) of the Rules and Regulations of the F.C.C. pending argument of the appeal be, and it hereby is granted." [17]

---

15. An amended version of the financial interest rule is at 47 C.F.R. § 73.658(j)(1)(ii) (1972).

16. Ex. 583.

17. Exs. 585, 586, 584; Ex. 583 p. 3.

At the argument of the appeal on January 19, 1971 the Court of Appeals continued the same stay it had granted on October 19, 1970 until 30 days after the issuance of the mandate.[18] The appeal was decided on May 3, 1971, Mount Mansfield Television, Inc. v. F. C. C., 442 F.2d 470 (2 Cir. 1971), and the mandate was issued on June 23, 1971.[19] Since the 30th day following issuance of the mandate was July 23, 1971 the "financial interest" rule became effective to prohibit any television network from acquiring any such interest after that date.

Since I have found that there was a binding oral agreement in 1970, the FCC regulation was not effective to make the agreement, previously made, illegal.

The second point mentioned presents more difficulty. I have found that there was no right to assign expressly reserved in the 1970 oral agreement. When Tandem came to a meeting of the minds with CBS, it had the right to assume that non-network syndication and foreign distribution would be performed by CBS itself or by its wholly-owned subsidiary, CBS Enterprises, which normally handled television distribution. Although the impact of the proposed regulation was primarily directed against the major networks, it surely must have been brought to the attention of packagers and their counsel.[20] Whether or not both parties knew of the impending regulation prohibiting the networks from having a financial interest in syndication, the evidence indicates that the matter was simply not discussed. Both parties assumed that the granting of distributorship rights, including domestic syndication, to CBS was legal.

On September 25, 1970, CBS circulated a draft "Memorandum of Agreement," dated as of July 10, 1970.[21] The draft contained the following: "20) CBS may assign its rights hereunder in full or in part to any person, firm or corporation provided, however, that no such assignment shall relieve CBS of its obligations hereunder." This was a "boilerplate" clause customarily used by CBS in its agreements.

Mr. Hayes, the business manager of Tandem, made some comments on the draft on October 6, 1970 [22] but, essentially, comment was reserved for Mr. Martin Perlberger, the attorney for Tandem in Los Angeles. Apparently Mr. Perlberger was not asked to do anything for six months until April 1971 after CBS had "picked up" the series for another season,[23] the matter having been turned over to the West Coast for handling on March 31, 1971. On that date Sheldon Perry, Associate Director, Business Affairs of CBS, notified Tandem's agent, Creative Management Associates, that CBS "[is] operating under the Memorandum of Agreement dated as of July 10, 1970. . . ." [24] Hayes also, on March 26, 1971, referred to "the previously existing agreement." He also spoke of "adjustments in the existing agreement." [25]

Just as the oral agreement of July 10, 1970 was being negotiated, the FCC announced its "financial interest" regula-

18. Ex. 583 p. 6; Pisana tr. 557–59. Frank Pisana, Deputy Clerk of the United States Court of Appeals, testified that the stay and order referred to in the docket entry for January 19, 1971 (Ex. 583 p. 6) could not be found (Pisana tr. 556), but that he had been present in the courtroom on that date in his official capacity, had recorded the Second Circuit's order continuing the stay granted on October 19, 1970, and had reported such order to the docket clerk who made the entry on the docket sheet (Pisana tr. 557–58).

19. Ex. 583 p. 7; Pisana tr. 558.

20. The syndication and financial interest rules were first proposed for public consideration in March, 1965 (30 Fed.Reg. 14470). Mt. Mansfield, supra, 442 F.2d at 474.

21. Exhibit 12. It referred to "WALLY'S CASTLE," which was an earlier tentative title for "ALL IN THE FAMILY."

22. Ex. 16.

23. Perlberger tr. 561–66; Sipes tr. 224–26; Ex. 32.

24. Ex. 32.

25. Ex. 29.

tion on May 4, 1970, 23 F.C.C.2d 382, 402. There were various stays by the Court of Appeals and by April; 1971 the *Mount Mansfield* case, *supra,* had been argued and was *sub judice* in the Second Circuit.[26] Negotiations for amendment of the draft "Memorandum of Agreement as of July 10, 1970" continued on the West Coast from April 1, 1971 to July 22, 1971, when CBS prepared a final version of the agreement, reflecting the parties' resolution of all questions.[27] Amendments of certain fees and costs were made, but CBS wrote, "[e]xcept as modified above, all other terms and conditions of said July 10, 1970 Memorandum of Agreement shall remain in full force and effect and are hereby ratified and confirmed." Paragraph 20, the assignment clause, still remained.

By this time, of course, Tandem, as well as CBS, was aware that CBS had applied to the FCC for permission to "spin off" to its shareholders a company which would have the syndication and distribution rights which CBS had. The spin-off of Viacom, the new entity, was approved by the FCC on June 3, 1971. 30 F.C.C.2d 9, and by the Ninth Circuit on November 12, 1971. Iacopi v. F. C. C., *supra.* Its stock was distributed to the CBS stockholders pursuant to the Commission's directions.

In connection with the "spin-off," CBS and Viacom entered into an agreement made "as of December 31, 1970."[28] Under the December 31, 1970 agreement CBS, in exchange for the Viacom stock, assigned to Viacom whatever rights it possessed or acquired, to distribute in syndication throughout the world, certain identified program series [29] initially broadcast prior to December 31, 1970, and all other programs or program series initially broadcast after that date during the balance of the 1970–71 broadcast season or during the 1971–72 broadcast season.[30]

Beginning with March or April of 1971, Tandem raised objections to giving CBS a blanket right of assignment. After Tandem learned that CBS intended to assign the distribution rights to ALL IN THE FAMILY to Viacom, Tandem made further objections. Hayes, the business manager of Tandem, discussed the problem at length with Gerald Rubin[31] and with Donald Sipes,[32] Vice-Presidents of CBS. Sipes discussed it with the CBS personnel [33] and with Block of Viacom.[34] Perlberger talked to Mrs. Nelson, the lawyer for CBS, about it.[35]

CBS refused to budge, and Tandem finally signed the agreement with the assignment clause intact, knowing that CBS was assigning the distributorship to Viacom. Indeed, Hayes of Tandem met with Block of Viacom before the agreement was signed.[36]

■ Tandem maintains that, although it signed the contract with the obnoxious assignment clause, it, nevertheless, told CBS that it had reservations whether CBS could validly assign to Viacom under that clause. The objection was in no way based on alleged illegality because of the FCC "financial interest" rule.[37]

The difficulty with the argument is that it flies in the face of the parol evidence rule. What the assignment of

---

26. On May 3, 1971, the Court decided that the "financial interest" rule was valid.

27. Ex. 63.

28. Hayes tr. 410 ; Block tr. 244–45.

29. Ex. 410, ¶ 1 and Ex. D ¶ II ; Block tr. 245.

30. Since ALL IN THE FAMILY was initially broadcast over the CBS television network during the 1970–71 broadcast season (Sipes tr. 203), Viacom under the December 31, 1970 agreement was entitled to whatever syndication rights CBS had on December 31, 1970 or thereafter acquired.

31. Hayes tr. 393.

32. Sipes tr. 148.

33. Sipes tr. 152.

34. Sipes tr. 165–65a ; Block Dep. 93.

35. Perlberger tr. 600–04.

36. Hayes tr. 396–97.

37. Perlberger tr. 623.

rights "in whole or in part," means is a matter for judicial construction. There is no claim that both CBS and Tandem had agreed to an interpretation of the clause.

The contention is simply that one signatory who interpreted the paragraph his own way, did not get the acquiescence of the other party, but signed the contract nevertheless. To accept such a contention, on the basis of oral testimony, would, I think, destroy the validity of integrated agreements.

When CBS submitted the final written agreement to Tandem, CBS wrote a side-letter dated August 26, 1971.[38] In this letter, CBS left it to Viacom and Tandem to formulate whatever new deal they wanted to make, subject to protecting the rights of CBS particularly with respect to non-interference with its network presentation. The new deal was to become effective to supersede paragraph 12, relating to distribution rights, only if an agreement between Tandem and Viacom "is finalized." In fact, there were negotiations, but no agreement was "finalized."

Tandem argues that the side-letter proves that there had been no agreement between CBS and itself on the meaning of the assignment clause, and that the side-letter was prepared for that very reason. I find no convincing proof of that. It was an acceptance and reemphasis of CBS' position that unless Tandem could make a better deal with Viacom and "finalize" it, Tandem would be bound to the deal already made. When Tandem signed the main agreement with CBS, which included distribution rights to CBS and the assignment clause, with knowledge that CBS intended to assign the distribution rights to Viacom, it was bound. Its signing of the contract, in the face of the side-letter, only emphasizes that its sole escape from the terms of the main contract was to "finalize" a different deal with Viacom. Tandem

knew, in any event, that the side-letter gave it no right to negotiate with anyone other than Viacom.

The unfruitful negotiations between Tandem and Viacom apparently continued into early 1973.[39] On March 26, 1973 Tandem sent Viacom a letter purporting to terminate Viacom's right to distribute ALL IN THE FAMILY.[40] On April 26, 1973 Tandem's attorneys notified CBS not to release any masters, tapes, or segments of the program without the permission of Tandem,[41] and CBS told Viacom it had notified its operation personnel to conform to Tandem's directive to CBS.[42] Tandem then entered into an agreement with Dana Murray, a film distributor in Toronto, to take over the foreign distributorship of ALL IN THE FAMILY commencing June 1, 1973.[43] That act apparently precipitated this action.

■ These acts of Tandem clearly constitute a breach of the exclusive distributorship given to CBS for a valuable consideration, which was assigned to Viacom. As assignee, Viacom may sue for such breach. Epstein v. Gluckin, 233 N.Y. 490, 492, 135 N.E. 861 (1922); Wagner v. Braunsberg, 5 A.D.2d 564, 568, 173 N.Y.S.2d 525 (1st Dept. 1958); Pacific Finance Corp. v. City of Lynwood, 114 Cal.App. 509, 300 P. 50, 53 (1931).

■ The grant of an exclusive license implies a covenant not to do anything which would interfere with the licensee's right to enjoy the fruits of the license. Kirk La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163 (1933); Madison Pictures, Inc. v. Pictorial Films, Inc., 6 Misc.2d 302, 316–21, 151 N.Y.S.2d 95 (Sup.Ct.N.Y. Co. 1956); Waverly Productions, Inc. v. RKO General, Inc., 217 Cal.App.2d 721, 32 Cal.Rptr. 73, 80 (1963).

■ There was also an unjustifiable interference with the contract between

38. Ex. 709.

39. Block Dep. ¶ 19–22.

40. Ex. 595.

41. Ex. 175.

42. Ex. 74.

43. Perenchio Dep. 12–14.

CBS and Viacom. Reiner v. North American Newspaper Alliance, 259 N.Y. 250, 254–55, 181 N.E. 561 (1932); Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 802–03, 101 N.Y.S.2d 483 (Sup.Ct.N.Y. Co.1950), aff'd, 279 App.Div. 632, 107 N.Y.S.2d 795 (1st Dept. 1951).

■ At the time Tandem gave CBS syndication rights in conjunction with the network broadcast right, it did not conceive that CBS would assign the syndication rights. Tandem might, therefore, have had a right to rescind. But Tandem passed up its opportunity to rescind by signing the contract, knowing of the assignment to Viacom.

■ Tandem argues, however, that a general clause permitting the assignment of rights cannot be construed as permitting the assignment of burdens, without the consent of the other party.

The evidence shows, however, that, prior to signing, Tandem actually knew the construction put on the assignment clause by the other party, CBS. Tandem could have refused to sign until it had made a new arrangement with Viacom. It not only signed, knowing the circumstances, but it also negotiated with Viacom directly even to the point where Tandem now contends, paradoxically, that it had a binding agreement with Viacom.

The negotiations between them establish that Viacom was hardly *persona non grata* to Tandem. The hard points were the term of the distributorship and the minimum sales per program guarantees by Viacom, rather than the capability of Viacom to assume the distributorship duties of CBS.

The assignment clause, in my judgment, permitted an assignment of distributorship rights which could not be effective without the concurrent assignment of distributorship duties. That is what Tandem agreed to when it signed the agreement although it knew that this is precisely what CBS intended the clause to mean. There is no writing by Tandem which puts a gloss on CBS'

side-letter, or which says that if Tandem cannot come to an agreement with Viacom, it reserves the right to contend that CBS has no right of assignment at all. It is doubtful whether CBS would have signed under such circumstances, for it had a good faith obligation to its shareholders who were the recipents of the Viacom shares.

The argument that, although CBS had the right to assign, it never actually did so, is not convincing in the light of events. Viacom has been sublicensing abroad in foreign territories. It has been paying Tandem its share of the revenues collected, and Tandem has accepted them, if not with pleasure, at least with good grace. The correspondence between CBS and Viacom, in any event, constitutes an assignment, though formality hardly appears to be the long suit of house counsel in the industry— perhaps a sign that Hollywood lawyers are, like country lawyers, more trusting than their big city brothers.

■ Tandem's contention that the license to distribute ALL IN THE FAMILY is terminable at will because the July 10, 1970 Agreement does not expressly state a term of duration, is without merit. As Professor Nimmer has stated, "Where an assignment or license does not expressly prescribe the period or term of its duration, it will generally be construed (in the absence of evidence of a contrary intent) to be effective for the duration of the then existing copyright term of the work." Nimmer, Copyright § 125.7 at 551 (1973 ed.). Indeed, in Manners v. Morosco, 258 F. 557 (2 Cir. 1919), the plaintiff granted the defendant an exclusive license silent as to duration, to produce and perform plaintiff's copyrighted play. In plaintiff's action to enjoin defendant from producing the play, the Court held:

"Since the contract is not revocable by will by either party or otherwise limited as to its duration by its express terms or by the inherent nature of the contract itself with reference to

its subject-matter, it is presumably intended to be permanent or perpetual in the obligation it imposes." 258 F. at 559.

This construction was expressly affirmed by the Supreme Court, while reversing on other grounds. Manners v. Morosco, 252 U.S. 317, 325, 40 S.Ct. 335, 64 L.Ed. 590 (1919).

### The Fifth Defense

The Fifth Defense alleges that the purported agreement between CBS and Tandem pursuant to which CBS acquired the exclusive right to syndicate or distribute ALL IN THE FAMILY was unlawful and void, because CBS coerced Tandem into granting it the syndication rights by conditioning Tandem's access to the CBS television network during prime evening hours upon the granting of such rights.

The plaintiffs contend that if Tandem has an antitrust claim it should be raised in a separate action, and that since Tandem has received benefits from the contract, it cannot now avoid its obligations thereunder by alleging that the contract is illegal.

In essence, the defendant claims that a judgment against it would have the effect that the Court would be enforcing a contract illegally obtained by coercion. The plaintiffs contend that a party should not obtain the benefits of a contract and then withhold the consideration promised. Although a plaintiff generally must prove it was *coerced*, not merely persuaded in the tie in, Ford Motor Co. v. United States, 335 U.S. 303, 316–20, 69 S.Ct. 93, 93 L.Ed. 24 (1948); American Mfrs. Mut. Ins. Co. v. American B.–P. Theatres, Inc., 446 F.2d 1131, 1137 (2 Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L. Ed.2d 752 (1972), on the tender of proof I must assume that Tandem could prove coercion.

A summary of the offer of proof is as follows:

CBS, engaged in interstate commerce, owned five television stations in a network that includes about 200 affiliates. By 1964 for economic reasons prime time network television had become virtually the only economically profitable market for television adventure, drama and comedy entertainment programs. The increase in production costs, by 1964, had largely priced such programs out of the syndication market. Buying power is concentrated in the three networks which control access to prime time network television. The bulk of television programs are produced by independent producers and then sold to one of the three national networks for exhibition. Although networks produced only 19.8% of all prime time network programs in 1964, they received interests in the syndication and other subsidiary rights in 75.7% of all programs exhibited on the networks during that year. In 1968 CBS produced 17.8% of all prime time programs carried on the CBS television network, but participated in the syndication and other subsidiary rights to 79.5% of the prime time programs carried on the network. During the negotiations between Tandem and CBS, Tandem sought unsuccessfully to retain the syndication rights to ALL IN THE FAMILY. In refusing, CBS is said to have stated that Tandem did not have sufficient bargaining power to retain the syndication rights. There is competition among companies engaged in syndication to whom producers can sell syndication rights for valuable consideration. Tandem was prevented, and is being prevented, from selling syndication rights in the syndication rights market and, hence, is being restrained in trade and commerce. The offer of proof then quotes from the Federal Communications Commission findings to the effect that the prohibition of domestic syndication by the networks would make for fairer competition.

The FCC by its "financial interest" rule has recognized that the major networks tend to have monopoly power. Such power includes the ability to require the packager to grant to the network the right to syndicate domestically

and to distribute in foreign territories as a prerequisite to network access. For purposes of legal discussion, we may assume that CBS by its power in the market place had the power to coerce Tandem into granting the rights in suit. We may also assume that Tandem does not seek rescission but is quite happy in the continuation of the network broadcast on CBS and in receiving the revenues appertaining thereto.

For reasons of confidentiality the exhibits have been covered by protective order, and I shall not divulge the actual amounts paid to Tandem by CBS from the beginning to the present. Suffice it to say, for these purposes, that it is in the millions of dollars. As its share of the foreign syndication rights as well, Tandem has been paid and has accepted from Viacom through June 30, 1973, the amount of $105,925.23.

 The FCC's "syndication" and "financial interest" rules were not based on an alleged violation of the Sherman Act. The FCC has no power to enforce the Sherman Act and does not purport to do so. National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). It did not find, in fact, in its promulgation of the syndication rule "that the networks *now* dominate the syndication business," Mt. Mansfield Television, Inc. v. F.C.C., *supra*, 442 F.2d at 487. The rule was "aimed at potential rather than actual domination or restraints . . . ." *Id.* Accordingly, the Commission has not preempted the antitrust field, and a private action for violation of the Sherman Act would lie.[44]

This action, however, is not such an action. The antitrust claim is offered as a defense to the action. As a shield, it may be paper thin.

Tandem is right when it says that the consideration is divisible. There are fixed license fees for the network broadcast, and there are separate determinable license fees for domestic and foreign syndication. Indeed, if the assignment to Viacom is upheld, there will be a complete separation of the fees paid for the respective licenses. The syndication rights remain the subject of a separate contract, though incorporated in the same document.

The issues for decision are these. Is the Fifth Defense an attempt to take advantage of the benefit of selling the network license without accepting the burden of the related distributorship agreement? Or is the attempted enforcement of the distributorship agreement a separate matter which requires the active intervention of a court of equity to enforce it? In any event, does the Sherman Act allow an implicit defense, not explicit in the statute, in any breach of contract action, whether at law or in equity?

The Supreme Court in Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), went quite far in its holding that a Sherman Act defense could not be interposed in a suit for breach of a contract to take delivery of onions, which was allegedly part of a restrictive conspiracy to keep onions off the market in order to raise the price.

The court said that "[a]s a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court." 358 U.S. at 518, 79 S.Ct. at 431. Mr. Justice Brennan noted that the Supreme Court had "observed that the Sherman Act's express remedies could not be added to judicially by including the avoidance of private contracts as a sanction [citing D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174–75, 35 S.Ct. 398, 59 L.Ed. 520 (1915)]" 358 U.S. at 519, 79 S.Ct. at 431. He added that "the federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act." *Id.* There was, perhaps, an implied exception

---

44. The judicial approval of the specific spin-off of Viacom by CBS with this bundle of rights, Iacopi v. F.C.C., 451 F.2d 1142 (9 Cir. 1971), is not binding on Tandem since it was not a party.

"where the judgment of the Court would itself be enforcing the precise conduct made unlawful by the Act. . . ." *Id.* 358 U.S. at 520, 79 S.Ct. at 432. See Dickstein v. duPont, 443 F.2d 783 (1 Cir. 1971).

Earlier the Court had said in Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597 (1925): "It is only where the invalidity is inherent to the contract that the act may be interposed as a defense. With that exception the remedies which the act provides for violations of it are exclusive." 267 U.S. at 252, 45 S.Ct. at 302.

■■■■■ Such inherent invalidity may perhaps be found in resale price maintenance agreements, exclusion from territories agreements, group boycotts, or overall illegal schemes to monopolize. These are merely illustrative of what I take to be inherently invalid agreements. A contract for the sale of goods or the granting of a license, regardless of background, is not inherently invalid. But cf. Associated Press v. Taft-Ingalls Corporation, 340 F.2d 753 (6 Cir. 1965), and cf. dissenting opinion at 769. In the absence of a definitive statement from higher authority, my own judgment must be that unless the act ordered by the Court is itself illegal, the contract is not subject to the antitrust defense. There is no such act to be ordered here.

It does not seem to me that this result is inequitable. Tandem made its bargain and got for itself a very good thing, a major network broadcast. I sympathize with their disappointment that it is not the CBS subsidiary, CBS Enterprises, which is doing the distribution as was expected. But I daresay the antitrust defense would have been stillborn if CBS Enterprises had not been pushed out of the picture by the FCC. Though Viacom may seem a less desirable mate, its suggested infirmities hardly defeat the rule of Kelly v. Kosuga, *supra*.

I must strike the Fifth Defense and hold the tendered evidence inadmissible. Accordingly, I find the validity of the license to be unimpaired by the antitrust defense and that the license is alive and subsisting. Viacom is entitled to a declaratory judgment and injunctive relief.[45] Plaintiff may submit an appropriate decree and judgment on notice.

The foregoing constitutes the findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

---

45. I have granted Tandem's motion to exclude Exhibits 56, 79, 84, 85, 87, 128, 133 and 138 because of the attorney-client privilege.